GENERAL MOTORS CORPORATION, Plaintiff-Appellee, v. JACK DOUGLASS, Defendant-Appellant.

First District (5th Division)   No. 1—88—3670

Opinion filed November 30, 1990.

Lee T. Hettinger, of Chicago, for appellant.

John J. O'Malley and Gregory W. Beihl, both of Pope, Ballard, Shepard & Fowle, Ltd., of Chicago, for appellee.

PRESIDING JUSTICE COCCIA delivered the opinion of the court:

## I

Defendant Jack Douglass appeals from the circuit court's entry of summary judgment against him and in favor of plaintiff General Motors Corporation on count III of its complaint. In count III, General Motors accused Douglass of converting $37,364.36. Because we have concluded that General Motors did not establish conversion on the part of Douglass, this case must be reversed and remanded.

## II

General Motors filed its three-count complaint on March 30, 1987. It directed count I against Jack Douglass Chevrolet, Inc. In count I, General Motors alleged that Douglass Chevrolet was one of its authorized dealers prior to January 1984. As part of the business relationship between General Motors and Douglass Chevrolet, General Motors maintained a "holdback account" concerning Douglass Chevrolet. From time to time, General Motors made payments to Douglass Chevrolet from the holdback account. About May 21, 1984, General Motors issued a check payable to Douglass Chevrolet, among others, for $50,201.24. General Motors believed that this amount represented the current balance in the holdback account for Douglass Chevrolet. General Motors attached a copy of this check to its complaint as an exhibit. General Motors went on to allege that the actual balance for Douglass Chevrolet on that date was $12,836.88, which resulted in an overpayment to Douglass Chevrolet of $37,364.36. The check containing this overpayment was later endorsed by Douglass Chevrolet, among others. General Motors charged that, by its endorsement and negotiation of the check, Douglass Chevrolet converted $37,364.36 to its own use. Douglass Chevrolet failed and refused to return this sum, General Motors concluded, although it duly demanded payment.

General Motors also directed count II against Douglass Chevrolet. After incorporating the relevant allegations of count I, General Motors went on to allege that Douglass Chevrolet became indebted to it by endorsing and negotiating the check including the overpayment. In December 1984, an account was stated between General Motors and Douglass Chevrolet. Upon this statement, a balance of $37,364.36 was found due from Douglass Chevrolet to General Motors. It attached a copy of this account, which listed $37,364.36 under a column labelled "debit," as an exhibit to its complaint. On several occasions beginning in December 1984, the account was mailed to Douglass Chevrolet.

Douglass Chevrolet failed and refused to pay this sum, General Motors concluded, although it duly demanded payment.

In count III, General Motors proceeded against Jack Douglass individually. After incorporating the relevant allegations of count I, General Motors went on to allege that Douglass was the president and sole stockholder of Douglass Chevrolet. Douglass, among others, endorsed and negotiated the check that included the overpayment of $37,364.36. By endorsing and negotiating the check, General Motors charged, Douglass converted its $37,364.36 to his own use. General Motors concluded that he failed and refused to return this sum although it duly demanded payment.

Douglass Chevrolet and Douglass, individually, answered General Motors' complaint on September 18, 1987. Regarding count III, Douglass admitted that in 1984, and prior to that time, Douglass Chevrolet was a Delaware corporation authorized to do business in Illinois. Douglass further admitted that prior to January 1984, Douglass Chevrolet was an authorized dealer of General Motors; that from time to time Douglass Chevrolet received payments from a holdback account with General Motors; that Douglass Chevrolet received a check made payable to it and General Motors Acceptance Corporation (GMAC) for the amount of $50,201.24, which was drawn from the account of General Motors' Chevrolet Motor Division and dated May 21, 1984; and that in his capacity as president of Douglass Chevrolet he signed his name as payee on the back of the check and deposited it into Douglass Chevrolet's account at the First National Bank of Hinsdale. Douglass denied that, by endorsing and negotiating the check, he converted General Motors' $37,364.36 to his own use. Finally, Douglass admitted that he had not paid $37,364.36 to General Motors. As far as the remaining allegations of count III were concerned, Douglass answered that he was without sufficient knowledge to determine their truth or falsity and, therefore, neither admitted nor denied them, but demanded strict proof thereof.

On June 20, 1988, General Motors moved for summary judgment against Douglass on count III of its complaint. General Motors argued that there was no genuine issue as to any material fact and that it was entitled to judgment as a matter of law. Its motion was based upon the admission of Douglass, in his answer, that he had endorsed and negotiated the check. By so doing, General Motors contended, Douglass converted its $37,364.36 and was individually liable for the overpayment. General Motors' motion was also based on the affidavit of Norm F. Corda. General Motors attached a copy of Corda's affidavit to its motion. Corda, senior administrator of accounts receivable

for Chevrolet Motor Division of General Motors, stated that General Motors issued a check in the amount of $50,201.24, payable to Douglass Chevrolet and GMAC, on May 21, 1984. On that date, General Motors' records mistakenly indicated that it owed $50,201.24 to Douglass Chevrolet. In fact, Corda conceded, the correct amount owed by General Motors to Douglass Chevrolet was $12,836.88. The General Motors account on which the check was drawn was later debited by $50,201.24, Corda affirmed.

Douglass responded to General Motors' motion for summary judgment on August 22, 1988. In his response, Douglass asserted that General Motors failed to establish the essential elements of the tort of conversion. Douglass also attached his affidavit to the response. In the affidavit, Douglass stated that he was president and sole stockholder of Douglass Chevrolet, which was an automobile dealership for Chevrolet Motor Division of General Motors. Under the terms of a dealership agreement between General Motors and Douglass Chevrolet, General Motors owed Douglass Chevrolet money based on a percentage of the money Douglass Chevrolet had paid to General Motors for cars it had bought from General Motors over a period of time. Checks made payable to Douglass Chevrolet and GMAC were mailed to Douglass Chevrolet from time to time in payment of the money owed by General Motors. In May or June of 1984, Douglass Chevrolet received a check made payable to it and GMAC in the amount of $50,201.24 drawn from the account of General Motors' Chevrolet Motor Division. Douglass affirmed that at no time, either as an individual or as president of Douglass Chevrolet, did he attempt to persuade General Motors to deliver or make payable to Douglass Chevrolet the check in question; at no time while the check was in the possession of Douglass Chevrolet did General Motors indicate to him or to Douglass Chevrolet that it had not authorized full payment to Douglass Chevrolet on the check or had overpaid the amount due and owing to Douglass Chevrolet on its account; and at no time did General Motors indicate to Douglass or Douglass Chevrolet that it was restricted in the use of the check, or that it was entrusted to use the check for certain purposes, or that it was required to deposit the check into a special account. Lastly, Douglass stated that at no time while the check was in the possession of Douglass Chevrolet did General Motors request or demand return for the amount of the check or any part of it.

After General Motors replied to Douglass' response, its motion for summary judgment was heard on November 22, 1988. At the hearing, counsel for Douglass informed the circuit court during argument that

Douglass Chevrolet had been sold between the time it received the check and six months later, when General Motors demanded payment. The circuit court granted General Motors' motion. Although the court concluded that there was no unauthorized taking of the check, it ruled:

"[O]nce that check was submitted and then there was a demand, the conversion took place at that point.

\* \* \*

At the point where demand was made and the overpayment was not returned."

That same day, the circuit court entered an order granting summary judgment against Douglass and in favor of General Motors on count III of its complaint, finding that there was no just reason for the delay of enforcement of its order pursuant to Illinois Supreme Court Rule 304(a). (See 107 Ill. 2d R. 304(a).) Douglass then appealed to this court. He is represented by different counsel on review.

### III

■ Although General Motors argues that the abuse of discretion standard governs review of orders granting summary judgments, the better view is that the granting of a motion for summary judgment is not a matter of judicial discretion. Rather, the normal deference a reviewing court grants an order of a trial court is not applicable to orders granting summary judgments, in order to ensure that a party's right to trial by jury has not been unjustly lost. (See R. Michael, 4 Illinois Practice: Civil Procedure Before Trial §38.5, at 233 (1989).) And, where a plaintiff has moved for summary judgment, the materials relied upon must establish the validity of the plaintiff's factual position on all the contested elements of the cause of action. (R. Michael, 4 Illinois Practice: Civil Procedure Before Trial §38.5, at 229 (1989).) In other words, the plaintiff's affirmative evidence must establish all essential elements of the claim not admitted in the pleadings. R. Michael, 4 Illinois Practice: Civil Procedure Before Trial §40.3, at 270-71 (1989).

■ With the appropriate standard of review in mind, we turn to a consideration of whether General Motors has established the essential elements of its conversion claim. The modern action for the tort of conversion always has been colored by its descent from the ancient common law form of action of trover, which originated as a remedy against the finder of lost goods who refused to return them. (See Restatement of Torts (Second) §242, comment *d*, at 474 (1965).) Until comparatively recently, the fiction of losing and finding persisted in the pleading of the action. However, the basis of the tort was consid-

ered to be an interference with possession of a chattel, or with the right to immediate possession. (See Restatement of Torts (Second) §222A, comment *a*, at 431-32 (1965).) Although the common law forms of action such as trover and conversion have long since been abolished in this State, if the sort of relief formerly encompassed by them is sought, the same substantial averments formerly required must be pleaded. (See *Mid-America Fire & Marine Insurance Co. v. Middleton* (1984), 127 Ill. App. 3d 887, 889, 468 N.E.2d 1335, 1336.)[1] Consequently, a proper complaint for conversion must allege: (1) an unauthorized and wrongful assumption of control, dominion, or ownership by defendant over plaintiff's personalty; (2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property. (*Middleton*, 127 Ill. App. 3d at 891, 468 N.E.2d at 1338.) The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held. *In re Thebus* (1985), 108 Ill. 2d 255, 259, 483 N.E.2d 1258, 1260.

In this case, General Motors alleged in count III of its complaint that Douglass converted its $37,364.36 when he endorsed and negotiated the check including the overpayment. But the circuit court ruled that Douglass converted General Motors' money later, when he refused its demand that he return the overpayment. As far as either date is concerned, however, we have concluded that General Motors failed to establish the essential elements of conversion.

We focus first upon General Motors' theory that conversion occurred at the time of Douglass' endorsement and negotiation of the check. Plaintiffs in *Douglass v. Wones* (1983), 120 Ill. App. 3d 36, 458 N.E.2d 514, were victims of a bad-check scheme. They sought to hold certain banks liable for conversion. The defendant who perpetrated the scheme requested and received from plaintiffs checks drawn by them payable to the defendant banks. After the circuit court granted the banks' motions to dismiss, plaintiffs appealed. The appellate court

---

[1]"Forms of action are dead, but their ghosts still haunt the precincts of the law. In their life they were powers of evil, and even in death they have not wholly ceased from troubling. *** In no branch of the law is this more obvious than that which relates to the different classes of wrongs which may be committed with respect to chattels. In particular the law of trover and conversion is a region still darkened with the mists of legal formalism, through which no man will find his way by the light of nature or with any other guide save the old learning of writs and forms of action and the mysteries of pleading." Salmond, *Observations on Trover & Conversion*, 21 L.Q. Rev. 43 (1905), quoted in W. Keeton, *Prosser & Keeton on Torts* §15, at 88 n.3 (5th ed. 1984).

held that a conversion action could not lie against the payee banks. The court began its analysis by noting that an essential element of conversion is the plaintiff's immediate right of possession as against the defendant. Even though the payee banks were not entitled to holder in due course status under the Uniform Commercial Code, the court reasoned, they were holders of the checks, for they were in possession of instruments payable to their order. (*Wones*, 120 Ill. App. 3d at 45, 456 N.E.2d at 522, citing Ill. Rev. Stat. 1979, ch. 26, par. 1—201(20).) As the payee banks were holders of the instruments, and thereby entitled to possession, a conversion action could not be maintained against them. The court also relied on the comments to section 3—419 of the Uniform Commercial Code, which state that a negotiable instrument is the property of the holder. (*Wones*, 120 Ill. App. 3d at 47, 458 N.E.2d at 523, citing Ill. Ann. Stat., ch. 26, par. 3—419, Uniform Commercial Code Comment 2, at 328 (Smith-Hurd 1963).) Because they were holders of the checks, the defendant banks became owners of the instruments; as between the drawer plaintiffs and the payee banks, the banks had the immediate right to possession of the instruments at the time of negotiation. And, the court stated, the Uniform Commercial Code provided that an instrument's holder may transfer or negotiate it or enforce payment in his name. *Wones*, 120 Ill. App. 3d at 47, 458 N.E.2d at 523, citing Ill. Rev. Stat. 1979, ch. 26, par. 3—301.

Here, the check attached to General Motors' complaint was drawn by it upon Citibank, N.A., New York, New York, and made payable to Douglass Chevrolet and GMAC. The back of the instrument reflects that it was endorsed by GMAC, without recourse, and by Douglass, as president of Douglass Chevrolet. Although Douglass may not have been entitled to holder in due course status, in light of *Wones* he could not have converted this check merely by endorsing and negotiating it. Douglass was entitled to possession of the instrument; he became its owner as between himself and the drawer, General Motors; he had the immediate right of possession; and he also had the right to negotiate the check. Thus, an essential element of conversion—General Motors' immediate right of possession as against Douglass—is lacking, at least at the time of endorsement and negotiation. Accordingly, General Motors failed to establish that Douglass committed an act of conversion by endorsing and negotiating the check containing the overpayment.

■ We now turn to the basis of the circuit court's ruling, namely that Douglass converted General Motors' money later, when he refused its demand. Resolution of this issue requires discussion of a line of cases that can be traced to *Kerwin v. Balhatchett* (1909), 147

Ill. App. 561. Defendant in *Kerwin* was the medical attendant for plaintiff's family. After the death of plaintiff's husband, she received a check for $2,000. Plaintiff herself was ill at this time, and defendant took the money with her knowledge and consent. She also owed defendant about $170 for services and disbursements. Plaintiff brought an action of trover, and she recovered judgment upon the jury's verdict for $1,256.86. Defendant appealed, and the appellate court reversed, concluding that there had been no conversion. The appellate court reasoned:

> "The money was voluntarily given to defendant, to do certain things with—to pay himself the debt which plaintiff owed him and then to discharge other specified indebtedness of plaintiff and to account to her for the balance. The relation of debtor and creditor was thus created between them. Trover lies for specific chattels wrongfully converted, and not for money had and received for payment of debts. It does not operate on chattels generally, but specifically, such as money in coin or bills, animals, or other property capable of identification as being the actual property or thing wrongfully taken and converted. [Citations.]" (*Kerwin*, 147 Ill. App. at 565-66.)

However, the appellate court held that on remand plaintiff had the right to change her action from trover to assumpsit. *Kerwin*, 147 Ill. App. at 567.

Since 1909, *Kerwin* has been followed in cases similar to ours. In *Middleton*, for example, plaintiff insurer filed an action of trover and conversion after its insureds were killed in an automobile accident. A dispute arose between plaintiff and defendants, the latter having represented the administrator of the insureds in a wrongful death and declaratory judgment action. Under the terms of a release prepared by plaintiff and signed by its insureds, plaintiff had the right to reimbursement from any settlement of the wrongful death actions. Yet that reimbursement was to be reduced by plaintiff's proportionate share of all reasonable costs incurred in effecting the recovery. The appellate court decided that plaintiff failed to establish the elements of conversion by a preponderance of the evidence. Relying on *Kerwin*, the appellate court stated that conversion lies only for a specific chattel. (See *Middleton*, 127 Ill. App. 3d at 892, 468 N.E.2d at 1338.) Because plaintiff had no right to a specific fund or specific money in coins or bills, the appellate court concluded, its right was only to an indeterminate sum. The proper action in such cases was assumpsit for money had and received. See *Middleton*, 127 Ill. App. 3d at 892-93, 468 N.E.2d at 1339.

The supreme court of Illinois cited *Kerwin* with approval in *Thebus*. *Thebus* was an attorney disciplinary proceeding, in which respondent was charged with conversion by withholding funds from his employees' wages and then failing to remit the amount withheld to the Internal Revenue Service (IRS) and to file an employer's quarterly tax return. After discussing the leading authorities on the law of conversion, including *Kerwin,* the supreme court stated that the general rule which has emerged is that conversion will not lie for money represented by a general debt or obligation; instead, it must be shown that the money claimed, or its equivalent, at all times belonged to plaintiff and that the defendant converted it to his own use. (See *Thebus,* 108 Ill. 2d at 261, 483 N.E.2d at 1261.) Applying this principle to the facts of the case before it, the court observed that although respondent was under an obligation to remit to the IRS the amount of money withheld as taxes, this obligation was in the nature of a debt to the government. The amount withheld was not a specified, identifiable fund capable of being the subject of a conversion. Respondent was not required to segregate the withheld sums from his general funds or to deposit them in a special bank account. (*Thebus,* 108 Ill. 2d at 262, 483 N.E.2d at 1261.) Indeed, respondent neither maintained a separate bank account in which the taxes withheld and owed to the IRS were deposited, nor did he maintain a separate payroll account. Because respondent was not required by law to segregate the tax money from his general funds or to deposit them in a separate bank account, and because respondent did not segregate the taxes owed to the IRS, the court held that there was a question of fact as to whether there was a fund capable of being the subject of a conversion, and whether there was a conversion at all. *Thebus,* 108 Ill. 2d at 263, 483 N.E.2d at 1262.

In *Eggert v. Weisz* (7th Cir. 1988), 839 F.2d 1261, the court of appeals relied on *Thebus* and *Middleton,* two cases which relied on *Kerwin.* Plaintiff Eggert sued to recover the proceeds from the sale of his stamp collection. Among others, he sued defendant Weisz, personally, as the latter's company no longer existed. A jury found Weisz liable for conversion, but the district court granted him judgment notwithstanding the verdict. Upon Eggert's appeal, the seventh circuit affirmed. Reviewing the facts of the case before it, the court noted that Eggert contemplated selling his collection of stamps and contacted Weisz, president and majority stockholder of Bob Weisz Stamps, for that purpose. Eggert consigned his entire collection to the company, which sold the stamps at various auctions. After each auction, the company deposited all sale proceeds in its general corpo-

rate bank account. The proceeds were not segregated from other corporate funds. After the company had sold much of Eggert's collection, but had not paid him in full, he told Weisz to hold the money for later payment. Eggert believed that Weisz agreed to segregate his money from general corporate funds, yet Weisz believed a debtor-creditor relationship, similar to that created by a bank deposit, had been created. Neither Eggert nor Weisz attempted to clarify their relationship. Subsequently, Weisz sold his business. Before and after Weisz sold the company, Eggert's money was treated as a loan. The money was deposited in the company's general corporate account and was used to pay general corporate debts. When, after Weisz sold the company, Eggert requested the money, the former's successors were unable to pay.

The reviewing court concluded that Eggert could not establish a cause of action for conversion because Illinois law limited the circumstances under which a plaintiff could maintain an action for the conversion of money. (*Eggert*, 839 F.2d at 1264.) Following *Thebus* and *Middleton*, the court reasoned that Eggert could not identify the money owed him as a specific chattel. The court also rejected Eggert's argument that Weisz promised to segregate funds. As Eggert could not identify the money owed him, he had no right to a specific fund or specific money in coin or bills; accordingly, there was liability for a debt rather than for a conversion. That is, the money held for Eggert was not a specific and identifiable fund that could be converted. See *Eggert*, 839 F.2d at 1265.

*Thebus* and *Eggert* were followed by the district court in *Rasmussen v. Sports Media Sales, Inc.* (N.D. Ill. 1988), 691 F. Supp 153. Defendants in *Rasmussen* moved for summary judgment on plaintiff's conversion claim. Plaintiff, who operated a sports broadcasting network, orally agreed with defendant Sports Media that it would sell advertising time on his network. Sports Media was not required to place funds received from the advertisers into a special account segregated from its other accounts, and the advertisers' payments were deposited into its general business account. Subsequently, plaintiff terminated the agreement. After Sports Media refused to forward certain revenues collected, plaintiff sued for $157,788.05. In their summary judgment motion, defendants argued that plaintiff could not recover the funds allegedly due and owing because they were not specifically identifiable and constituted only a debt. The district court granted the motion for summary judgment. Like the parties charged with conversion in *Thebus* and *Eggert*, the district court reasoned, Sports Media deposited the disputed funds in its general business account and was

under no contractual duty to place the funds in a separate account segregated from all other funds. (*Rasmussen*, 691 F. Supp. at 155.) The district court concluded that, in the absence of any duty to segregate funds, there was no property that could be the subject of a conversion action. To hold otherwise, the court opined, would result in an expansion of the conversion remedy that found no basis in Illinois law. See *Rasmussen*, 691 F. Supp. at 155.

*Kerwin's* progeny were also cited with approval in *Sutherland v. O'Malley* (7th Cir. 1989), 882 F.2d 1196. *Sutherland* arose out of a fee dispute between two attorneys. Plaintiff had asked defendant to serve as co-counsel in the representation of one of her clients. After a settlement in the amount of $127,000 was obtained, defendant caused the settlement payments to be sent to him and deposited them in his firm's client fund account. Under the fee contract with her client, plaintiff allegedly had a right to $50,800 in attorney fees. She filed suit to recover the fees, proceeding against defendant under a conversion theory, among other theories. The district court granted defendant's motion for summary judgment and plaintiff appealed. The seventh circuit affirmed, concluding that the district court properly rejected plaintiff's conversion claim, as she had a claim only for an indeterminate portion of the attorney fees generated by the settlement. (*Sutherland*, 882 F.2d at 1200.) Although defendant did not have an express contract with the plaintiff in the litigation that resulted in the settlement, the appeals court observed, he had performed substantial services. As a result, he had a *quantum meruit* claim for attorney fees. Therefore, the seventh circuit determined, plaintiff was not entitled to the entire $50,800 fund. While she may have been entitled to a portion of the fees generated by the underlying litigation, and could have instituted a breach of contract action against defendant, she could not make a claim for a specific, identifiable fund capable of being the subject of a conversion. (*Sutherland*, 882 F.2d at 1201.) Because plaintiff only had a claim for an indeterminate sum of money, she could not successfully maintain a conversion action under Illinois law, the court held. *Sutherland*, 882 F.2d at 1205.

The facts and principles of the these cases lead us to conclude that the circuit court erred in ruling that Douglass converted General Motors' money when he refused its demand well after endorsing and negotiating the check which included the overpayment. As in *Kerwin*, a relation of debtor and creditor was created between Douglass, on the one hand, and General Motors, on the other hand, when it voluntarily, albeit mistakenly, transferred money to him, some of which represented payment it confessedly owed him. That is, we refuse to say

that Douglass converted property which was voluntarily given to him in the first instance. Subsequent cases only serve to bolster this conclusion. In the language of *Middleton*, General Motors had a right to only an indeterminate sum of money. The guiding principle, as stated in *Thebus*, is that conversion cannot lie for money represented by a general debt or obligation. Here, General Motors failed to establish that the money at all times belonged to it and that Douglass converted it to his own use. Like the supreme court in *Thebus*, we doubt that there was a fund of money capable of being the subject of a conversion. In his affidavit, Douglass stated—and General Motors has not shown otherwise—that he was not required to segregate payments from the holdback account, and that he did not in fact segregate them. The Federal cases teach that Douglass may be liable in debt, but not in conversion, for General Motors has not identified a specific chattel. On remand, General Motors is free to seek leave to amend its complaint and proceed against Douglass under assumpsit for money had and received, account stated, or other theories that may be appropriate. Since other remedies may be available, this is not an appropriate case for expanding the admittedly limited circumstances under which a conversion action can be maintained in this State.

In sum, whether we focus upon the allegations of the complaint (that Douglass converted the money by endorsing and negotiating the check) or the circuit court's ruling (that conversion took place at the point of demand), General Motors was not entitled to summary judgement, for it failed to establish the essential elements of conversion.

## IV

Because we have concluded that the circuit court improperly granted summary judgment against Douglass and in General Motors' favor on count III of its complaint, this case must be reversed and remanded for proceedings consistent with our opinion.

Reversed and remanded.

GORDON* and MURRAY, JJ., concur.

---

*Justice R. Eugene Pincham participated in this case prior to his resignation. Since that time, Justice Joseph Gordon was designated the third member of the panel, and he has read the record and briefs and listened to the oral argument tapes.