RICHARD B. FONDA, Plaintiff-Appellant, v. GENERAL CASUALTY COMPANY OF ILLINOIS, Defendant-Appellee.

First District (1st Division)    No. 1—94—0899

Opinion filed April 22, 1996.

Angelo Ruggiero, of Chicago, for appellant.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini, Richard A. Buchanan, Michael L. Foran, and Melinda S. Kollross, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff, Richard B. Fonda, appeals from an order of the circuit court of Cook County granting judgment in favor of defendant, General Casualty Company of Illinois, on plaintiff's action for conversion of property. On appeal, plaintiff contends that the trial court erred in determining that plaintiff failed to prove a conversion. For the following reasons, we reverse the judgment of the trial court.

The record reveals the following relevant facts.[1] Vecente Nededog owned a convenience grocery store called "Ma & Pa's II," located in Waukegan, Lake County, Illinois. On August 26, 1983, Nededog, as debtor, executed a secured installment note (Note) in the amount of $28,700, plus 10% annual interest, to HBH, Inc. (HBH), as creditor. The Note provided that principal and interest were payable in consecutive monthly installments. The Note also afforded HBH a security interest (Security Agreement) in certain equipment, fixtures, goodwill, etc. and "proceeds therefrom." Copies of the Security Agreement and a Uniform Commercial Code (UCC) financing statement were recorded in the office of the Illinois Secretary of State (Secretary of State) on August 30, 1983.

On August 28, 1983, defendant issued a business owners insurance policy to Nededog, d/b/a "Ma & Pa's II." The policy did not identify HBH as a loss payee or entity insured or as an entity having an interest in the business.

On December 2, 1983, Ma & Pa's II was destroyed by fire. Nededog's business personal property was rendered totally damaged.

On February 5, 1984, HBH assigned the Security Agreement and Note to plaintiff. Plaintiff filed a UCC-3 form recording the assignment of the rights under the UCC financing statement with the Secretary of State on March 21, 1984.

Meanwhile, an adjusting firm evaluated the fire loss of December 2, 1983. During this period, defendant received a letter from plaintiff's counsel, Michael R. Esposito, dated March 16, 1984. Esposi-

_____
[1]The facts are disputed by the parties.

to's letter advised defendant that plaintiff had been assigned all of HBH's rights in "[e]quipment, fixtures, goodwill, inventory, trademarks, trade names, leasehold rights and proceeds therefrom in the business known as Ma & Pa II [sic]," and requested that defendant "make note of this Assignment and the interests of the Assignee in any insurance proceeds or coverage."

Defendant added plaintiff to Nededog's policy as a "loss payee" effective March 17, 1984.

On May 1, 1984, defendant paid Nededog $27,100.67 in insurance proceeds as a result of the fire loss. This sum represented the actual cash value of Nededog's damaged personal business property less a $100 policy deductible. Nededog kept the insurance proceeds and continued to make 32 monthly installment payments to plaintiff on the Note until December 26, 1986, at which time the balance was reduced to $20,091.70. Subsequently, Nededog defaulted on the Note, and in July 1987, was adjudged bankrupt.

On September 22, 1987, plaintiff made a demand on defendant by letter for the insurance proceeds for the loss that occurred on December 2, 1983. Defendant refused plaintiff's demand, and plaintiff filed a cause of action for conversion in March 1988. Plaintiff filed his first amended complaint on August 3, 1993, alleging: (I) conversion; (II) wilful and wanton conversion; (III) breach of contract; and (IV) violation of section 155 of the Illinois Insurance Code (215 ILCS 5/1 et seq. (West 1992). The trial court dismissed counts III and IV with prejudice on October 5, 1993, and these counts are not the subject of this appeal.

On October 26, 1993, the parties submitted to the trial court a "Statement of Agreed Facts." That same day, the trial court entered an agreed order as follows: (1) there are no genuine issues of material fact in dispute; and (2) the matter should be properly resolved on summary judgment pursuant to the statement of agreed facts submitted by the parties. The trial court took the matter under advisement.

On November 8, 1993, the trial court issued its order along with a detailed memorandum of opinion. The trial court found that while plaintiff was an assignee of a perfected security interest in the proceeds within the meaning of section 9—306 of the UCC (810 ILCS 5/9—306 (West 1992)), plaintiff's action for conversion could not lie under existing Illinois law. The trial court relied on *General Motors Corp. v. Douglass*, 206 Ill. App. 3d 881, 565 N.E.2d 93 (1990), for the proposition that a cause of action for conversion can only be maintained under limited circumstances and that the facts of this case did not mandate an expansion of the cause of action for conversion. The trial court found that there was no segregated or specific

identifiable fund in the hands of defendant and that plaintiff did not have the right to absolute immediate possession of a specific fund. The trial court further found that the letter from Esposito to defendant did not constitute a "demand" for proceeds, but rather a "notice." The trial court entered judgment in favor of defendant.

On December 3, 1993, plaintiff filed a motion for rehearing, retrial, or modification, or to vacate the judgment order of November 8, 1993. Plaintiff argued that the trial court improperly relied on facts not set forth in the statement of agreed facts, *i.e.*, that Nededog cancelled the insurance policy on February 1, 1984, after the loss of December 2, 1982, and requested return of some of the premium. Plaintiff argued that the trial court improperly made note of this fact both in the body of its memorandum of opinion and in a footnote. Plaintiff argued that consideration of this not-agreed-to fact was improper in that Nededog's policy was actually cancelled on May 8, 1994, after defendant received attorney Esposito's letter, but backdated to February 1, 1984. Therefore, plaintiff argued, the trial court could not have believed that defendant issued the insurance proceeds to Nededog prior to learning that plaintiff was a secured party.

Plaintiff further argued that Esposito's notification of assignment constituted a demand for the proceeds and that the trial court improperly relied on *General Motors* in reaching its conclusion because the case was factually distinguishable. Defendant filed a response to plaintiff's post-trial motion on January 20, 1994.

On February 8, 1994, the trial court entered an order vacating and supplanting its order of November 8, 1993. The trial court stated that its reason for supplanting the prior judgment order was that the order made reference by footnote and in the body of the opinion to a matter not among the stipulated facts. The trial court reconsidered the case, but maintained its stated belief that this case is controlled by *General Motors*, entering judgment in favor of defendant and against plaintiff. It is from this order that plaintiff filed his timely notice of appeal.

While the appeal was pending, plaintiff filed a motion to strike defendant's statement of facts from its brief. Defendant filed a response, and plaintiff filed a reply. This court has taken this motion with the case.

■ Preliminarily, we address plaintiff's motion to strike defendant's statement of facts. Plaintiff argues that defendant's statement of facts contains facts not agreed to by the parties, as well as improper argument, in violation of Supreme Court Rule 341(e)(6), which provides that the statement of facts shall contain facts "necessary to

an understanding of the case, stated accurately and fairly without argument or comment." 134 Ill. 2d R. 341(e)(6).

Plaintiff provides no authority for his proposition that this court may not consider the complete record filed on appeal. We note that the "Statement of Agreed Facts" as submitted by plaintiff fails to adequately explain the procedural history of the case. As plaintiff's argument is unsupported by authority, this court may proceed to discuss the merits of this case, disregarding any inappropriate or unsupported statements in reviewing this matter. *Geers v. Brichta*, 248 Ill. App. 3d 398, 618 N.E.2d 531 (1993); *Falk v. Martel*, 210 Ill. App. 3d 557, 559, 569 N.E.2d 248 (1991). We deny plaintiff's motion.

■ On appeal, plaintiff contends that the trial court erred in determining that he failed to prove a cause of action for conversion. The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held. *In re Thebus*, 108 Ill. 2d 255, 259, 483 N.E.2d 1258 (1985). A proper complaint for conversion must allege: (1) an unauthorized and wrongful assumption for control, dominion, or ownership by a defendant over a plaintiff's personalty; (2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property. *General Motors Corp. v. Douglass*, 206 Ill. App. 3d 881, 886, 565 N.E.2d 93 (1990). Where money is the subject of the alleged conversion, the plaintiff must further demonstrate that the money is capable of being described as a specific chattel. *Thebus*, 108 Ill. 2d at 260.

Plaintiff initially contends that attorney Esposito's letter dated March 16, 1984, properly notified defendant that plaintiff claimed an interest to any insurance proceeds. In the alternative, plaintiff argues that he was not required to make a demand for any specific proceeds because: (1) the proceeds were not yet payable; and (2) section 9—502(1) of the UCC does not require that a demand be made to secure a creditor's rights to insurance proceeds.

■ Plaintiff brings to this court's attention the Code Comments appearing after section 9—306, which clarify a secured party's automatic right to proceeds:

"**Official Reasons for 1972 Change [P.A. 77—2810]**

* * *

Heretofore an apparent inconsistency and ambiguity has existed between the last sentence of Section 9—203(1)(b) of the 1962 Code, which indicated that a claim to proceeds had to be an express term of a security agreement, and Section 9—306(2), which indicated that a right to proceeds was automatic without refer-

ence to a term of a security agreement. *This ambiguity has been clarified in favor of an automatic right to proceeds, on the theory that this is the intent of the parties, unless otherwise agreed."* (Emphasis added.) 810 ILCS 5/9—306, Uniform Commercial Code Comment, at 396 (Smith-Hurd 1992).

Thus, plaintiff in fact has an automatic right to insurance proceeds, as a secured creditor. The cases relied upon by defendant, *Chrysler Credit Corp. v. Smith (Appeal of Pennsylvania National Mutual Casualty Insurance Co.)*, 434 Pa. Super. 429, 643 A.2d 1098 (1994), and *Zorba's Inn, Inc. v. Nationwide Mutual Fire Insurance Co.*, 93 N.C. App. 332, 377 S.E.2d 797 (1989), are distinguishable, as those cases reveal scenarios where the creditor was not named by the insured as a loss payee. In the present case, defendant added plaintiff as a loss payee on March 17, 1984.

Plaintiff further contends that the trial court improperly relied upon *General Motors Corp. v. Douglass*, 206 Ill. App. 3d 881, 565 N.E.2d 93 (1990), in determining that plaintiff's claim for conversion could not stand. There, defendant, Jack Douglass Chevrolet (Douglass), was an authorized car dealership for General Motors. As part of the business relationship, General Motors maintained a "holdback account" with Douglass, from which General Motors made payments to Douglass from time to time. On May 21, 1984, General Motors issued a check payable to Douglass for $50,201.24 from the holdback account. Jack Douglass endorsed and negotiated the check. Subsequently, in December 1984, General Motors determined that actual balance due Douglass on May 21, 1984, was $12,836,88, and that Douglass was overpaid by $37,364.36. General Motors requested return of the sum of $37,364.36, and Douglass refused.

General Motors then filed a complaint against Douglass and Jack Douglass, individually, alleging that, by its endorsement and negotiation of the check, Douglass converted the $37,364.36 to its own use. General Motors then filed a motion for summary judgment based on Douglass' admission that he endorsed and negotiated the check. Douglass responded that General Motors failed to establish the essential elements of conversion because at no time while the check was in Douglass' possession did General Motors request or demand return for the amount of the check or any part of it. The trial court granted General Motors' motion, determining that a conversion occurred at the point where General Motors made the demand and the overpayment was not returned. *General Motors*, 206 Ill. App. 3d at 884-85.

On appeal, this court determined that an essential element of conversion is the plaintiff's immediate right of possession as against the defendant. As the check was made payable to Douglass, and Dou-

glass was the holder of the instrument, Jack Douglass could not have converted the check merely by endorsing and negotiating it:

"Douglass was entitled to possession of the instrument; he became its owner as between himself and the drawer, General Motors; he had the immediate right of possession; and he also had the right to negotiate the check. Thus an essential element of conversion— General Motors' immediate right of possession as against Douglass—is lacking, at least at the time of endorsement and negotiation." *General Motors*, 206 Ill. App. 3d at 887.

■ This court further determined that Douglass did not convert the money later, when he refused General Motors' demand. Relying on a line of Illinois cases reaching back to 1909, this court followed the general rule stated by our supreme court:

"[C]onversion will not lie for money represented by a general debt or obligation; instead, it must be shown that the money claimed, or its equivalent, at all times belonged to plaintiff and that the defendant converted it to his own use." *General Motors*, 206 Ill. App. 3d at 889, citing *In re Thebus*, 108 Ill. 2d 255, 261, 483 N.E.2d 1258, 1261 (1985).

This court determined that a relation of debtor and creditor was created between Douglass and General Motors, when General Motors voluntarily, albeit mistakenly, transferred money to Douglass, some of which represented payment it confessedly owed him. Thus, Douglass did not convert property which was voluntarily given to him in the first instance. Because conversion cannot lie for money represented by a general debt or obligation, General Motors failed to establish that the money at all times belonged to it and that Douglass converted it to his own use. Douglass stated in his affidavit that he was not required to segregate payments from the holdback account. Thus, Douglass may be liable in debt, but not in conversion, for General Motors failed to identify a specific chattel. This court remanded the matter to the trial court, finding General Motors free to seek leave to amend its complaint and proceed against Douglass under assumpsit for money had and received, account stated, or other appropriate theories. *General Motors*, 206 Ill. App. 3d at 892.

Plaintiff here distinguishes *General Motors* from the present case. Initially, plaintiff notes that there is no debtor-creditor relationship between Fonda and General Casualty. Plaintiff further argues that Fonda never voluntarily transferred his property to defendant General Casualty. The record shows that General Casualty came into possession of the property by means of an insurance contract it had with Nededog, Fonda's debtor. Once defendant had possession of the insurance proceeds and actually knew that plaintiff had a legal right

to those insurance proceeds, it was incumbent upon defendant to deliver the insurance proceeds to plaintiff and not someone else. Plaintiff argues that a conversion of his property occurred when defendant delivered the insurance proceeds to Nededog. Third, plaintiff notes that in *General Motors*, the plaintiff was free to proceed against Douglass under other theories that may be appropriate, while in the present case plaintiff has no alternative remedy.

Finally, plaintiff disputes the trial court's determination that "insurance proceeds" constituted "merely money" and not a specific fund which could have been subject to plaintiff's security interest. Plaintiff argues that the trial court's determination is contrary to section 9—306, which gives a creditor an automatic right to such proceeds, and also contrary to *Thebus*, upon which the *General Motors* court relies, *i.e.*:

> "Money may be the subject of conversion, but it must be capable of being described as a specific chattel, although it is not necessary for purposes of identification that money should be specifically earmarked." *Thebus*, 108 Ill. 2d at 260.

Plaintiff argues that his action is for the conversion of "insurance proceeds," which is distinguishable from money. Section 9—306(1) provides as follows:

> " 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. *Insurance payable by reason of loss or damage to the collateral is proceeds*, except to the extent that it is payable to a person other than a party to the security agreement. Money, checks, deposit accounts, and the like are 'cash proceeds.' All other proceeds are 'non-cash proceeds.' " (Emphasis added.) 810 ILCS 5/9—306(1) (West 1992).

Thus, plaintiff concludes that insurance proceeds can be described as specific chattel, as distinct from mere money.

We note that defendant failed to respond to plaintiff's arguments as set forth above.

Rather than relying on *General Motors*, plaintiff urges this court to follow the tenth circuit case *First National Bank v. American General Fire & Casualty Co.*, 927 F.2d 1126 (10th Cir. 1991). There, the plaintiff loaned Serigraphics Corporation (debtor) a sum of money. In return, debtor gave plaintiff a security interest in debtor's collateral: inventory and equipment and the proceeds therefrom. Plaintiff perfected its security interest by filing a financial statement with the county clerk.

Subsequently, the debtor's collateral was destroyed by fire, due to the negligence of a third party. The third party's insurer, the defen-

dant, paid the debtor for the destroyed inventory and equipment. Plaintiff then commenced an action against defendant, the insurer, asserting that because plaintiff had a secured interest in the insurance settlement as proceeds under section 9—306(1) of Oklahoma's Commercial Code (Okla. Stat. tit. 12A, § 9—306(1) (Supp. 1991)), defendant, who had constructive notice of that interest through the county filing, wrongfully converted the insurance settlement in violation of plaintiff's security interest. The district court granted defendant's motion for summary judgment, determining that the insurance settlement did not become proceeds subject to plaintiff's security interest until the debtor actually received those funds. *First National Bank*, 927 F.2d at 1127.

On appeal, the tenth circuit reversed. Under Oklahoma law:

> "Conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein. It is not necessary to constitute a conversion that the property come into the defendant's possession wrongfully. Nor is it necessary that the alleged converter apply the property to his own use, or be in bad faith." *First National Bank*, 927 F.2d at 1127, citing *Steenbergen v. First Federal Savings & Loan*, 753 P.2d 1330, 1332 (Okla 1987).

The tenth circuit found that the security agreement gave plaintiff a secured interest in the proceeds from debtor's inventory and equipment. Under section 9—306(1), plaintiff had a secured interest in the insurance settlement defendant paid debtor as a result of the fire. Oklahoma's section 9—306(1) defines proceeds as follows:

> "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable from any source by reason of loss or damage to the collateral is proceeds, even though such insurance payments may be made by third party tort-feasors or their insurers, except to the extent it is payable to a person other than a party to the security agreement." *First National Bank*, 927 F.2d at 1127, citing Okla. Stat. tit. 12A, § 9—306(1) (Supp. 1991) (effective March 29, 1984).

The court determined that under section 9—306(1), an insurance settlement becomes proceeds when it becomes "payable," not upon receipt by the debtor. Further, the perfection of plaintiff's security interest gave notice "to parties whose interests may be affected." The court concluded that defendant's transfer of these funds to debtor, contrary to plaintiff's perfected security interest of which defendant had constructive notice, amounted to a conversion. *First National Bank*, 927 F.2d at 1128.

*First National Bank* is factually comparable to the present case. Oklahoma and Illinois have almost identical section 9—306(1) provi-

sions defining "proceeds." Moreover, the present case presents an even stronger case for a conversion; here, defendant had actual notice of the security interest, while in *First National Bank* the defendant had merely constructive notice through the UCC filing perfecting the security interest.

In response, defendant cites *Fidelity Financial Services v. Blaser*, 889 P.2d 268 (Okla. 1994), as bearing "directly upon the issues before this Court." Defendant argues that *Fidelity* "rejects" the holding of *First National Bank*. In *Fidelity*, the debtor-defendants signed a promissory note and security agreement in favor of Fidelity for the purchase of an automobile. Fidelity perfected its security interest by filing a lien entry form with the Oklahoma Tax Commission. Subsequently, the automobile was damaged as a result of an accident with a tortfeasor. The tortfeasor's insurance carrier, Trader's, settled a claim with debtor-defendants and paid them $8,000 for the damage. Meanwhile, Trader's stored the automobile with a third-party garage for repairs. Subsequently, Trader's learned of Fidelity's interest and sought release of the lien. Fidelity refused to release the lien, and Trader's abandoned the automobile, which was sold to foreclose the garageman's lien. At the time of the sale, the debtors owed Fidelity $5,846.06. The debtors failed to pay Fidelity the balance of the loan with the money received from Trader's. *Fidelity*, 889 P.2d at 269.

Fidelity sued Trader's, alleging that: (1) Trader's interfered with its collateral by allowing storage and repair charges to be assessed against the vehicle and failing to pay for storage and for repairs to the vehicle; and (2) Trader's failed to obtain a release of lien from Fidelity, despite notice of Fidelity's lien, in violation of Fidelity's security interest. Trader's filed a motion for summary judgment, arguing that section 9—306 of the Oklahoma UCC did not create a duty on the part of a tortfeasor's insurance company to ascertain the existence of a lender's security interest, but merely provided a mechanism to track the secured interest and recover from the debtor or the debtor's transferee. The trial court entered judgment in favor of Trader's.

On appeal, Fidelity argued that: (1) Trader's had a duty under statutory and case law to satisfy Fidelity's lien prior to or simultaneous with its payment to debtors; and (2) Trader's had a duty as a matter of public policy to satisfy liens of record of which it has notice prior to the taking of title to collateral, pursuant to section 9—306. The court of appeals reversed the summary judgment granted in favor of Trader's and directed judgment in favor of Fidelity. *Fidelity*, 889 P.2d at 270.

Trader's appealed to the Oklahoma Supreme Court. The court

noted that cases cited by Fidelity, *e.g.*, *First National Bank,* are premised on conversion, which was not advanced as a theory of recovery in *Fidelity.* The court concluded:

> "In any event, we do not perceive that § 9—306 creates a duty on the third-party tortfeasor's insurance company *in this case* to protect Lender's security interest. Section 9—306 deals with continued perfection of a security interest in proceeds of the collateral, and provides that insurance payments shall be such proceeds. Providing that a security interest *continues* in insurance payments as proceeds is not the same as imposing a duty on a third-party tortfeasor's insurance company to protect that security interest." (Emphasis added and in original.) *Fidelity,* 889 P.2d at 272.

The Oklahoma Supreme Court did not reject the holding of *First National Bank,* but rather distinguished the case on its facts.

*Fidelity* is similarly distinguishable from the present case. In *Fidelity,* the insurance company was not the insurer of the damaged automobile and did not hold the proceeds of that collateral but, rather, held the insurance payment to settle a tort action which affected the collateral. There, the insurance company learned of Fidelity's security interest *after* paying out the settlement.

In contrast, defendant here held the proceeds of the fire-damaged grocery store, learned of plaintiff's security interest, then proceeded to pay the settlement to the debtor, Nededog.

■ The record in the present case shows that defendant had notice of plaintiff's security interest prior to paying the proceeds to Nededog. We may consider that plaintiff's letter of March 16, 1984, gave actual notice to defendant of plaintiff's security interest, which was then recorded on March 21, 1984, thereby constituting constructive notice. By the time defendant paid the proceeds out to Nededog in May 1984, defendant had sufficient notice that plaintiff was a secured party who should have received the settlement proceeds.

Plaintiff has shown his right in the property through the security interest; his right to immediate possession of the property through section 9—306(1); and a demand for the insurance proceeds, either on March 16, 1984, or in September 1987. We conclude that defendant wrongfully exerted control over plaintiff's property by improperly distributing the proceeds to Nededog, when plaintiff had a secured interest in the proceeds and defendant was so notified.

However, we also take into consideration the following additional factors: (1) plaintiff waited for almost three years after the insurance proceeds were paid to Nededog to request payment of the proceeds; and (2) at the time plaintiff requested the proceeds from defendant,

Nededog was indebted to plaintiff only $20,091.70, reduced from the original $27,000. Under the circumstances, plaintiff is entitled to recover only $20,091.70.

We therefore reverse the judgment of the trial court and remand this matter to the trial court for entry of an order awarding partial payment of the proceeds to plaintiff, not to exceed $20,091.70.

Reversed and remanded.

BUCKLEY and WOLFSON, JJ., concur.