333 P.2d 1084

**D. O. SHARTZER, Appellant,**

v.

**J. B. ULMER, Appellee.**

No. 6426.

Supreme Court of Arizona.

Jan. 14, 1959.

———◇———

Mahoney & Vincent, Florence, for appellant.

Richard R. Greenfield, Phoenix, for appellee.

UDALL, Justice.

This is an appeal from a judgment in favor of J. B. Ulmer, plaintiff (appellee), in the sum of $5,075 for damages against defendants D. O. Shartzer (appellant) and one Tom H. Spargo. For the sake of clarity the only two parties to this appeal will be designated either by name or as appellant and appellee, while the other defendant Spargo, who has not appealed, will be called by his surname.

The case was tried to the court, sitting without a jury, and while no formal findings of fact or conclusions of law were requested or made, the records of the trial court do disclose the basis for its ruling. The basic facts are not in serious dispute, but under our invariable rule—wherever there is a conflict—we shall state the facts in a light most favorable to a sustaining of the judgment. A divergence of opinion, however, does exist between the parties as to the application of legal principles to such facts.

Briefly it appears that at all times pertinent hereto appellant Shartzer was the owner of a ranch comprising some 40 to 50 sections of grazing land and about 200 cultivated acres. This is known locally as the "Crescent Ranch" and it lies somewhat between the towns of Kelvin and Winkelman in Pinal County. On or about October 21, 1951, appellant leased the grazing land to Spargo who, according to his testimony, was to stock the range and pay as rental "half the gain on the cattle I put on there." The appellant's version was that the only cattle to be placed on the ranch were those belonging to Spargo. He testified:

"* * * I wanted to lease it to someone that could stock the range, and he (Spargo) said, Well, he could get some more cattle and I asked him if he was financially able to stock the range and he said he could, so we made a deal that we put the cattle in on a gain basis."

Early in the year 1952 the terms of rental were changed to a flat rate of $10,000 per annum rental with no specified length of time for it to run. These transactions were all oral. Spargo took possession of the grazing range under the terms of his agreement with appellant Shartzer, and at all times here involved was in full and

complete control thereof without appellant in any way attempting to dictate the operation of the ranch. Spargo testified that the amended cash rental agreement was entered into before his deal (as next related) was made with appellee Ulmer.

Ulmer, a farmer and cattle feeder of Blythe, California, early in March 1952 was looking for pasture for some of his cattle. A local man directed him to Spargo whom he first met at Kelvin. The latter took him over the Crescent Ranch range so that he might see the feed situation, and this proving satisfactory they reached an agreement, viz.:

> "2.50 per head per month, and he was to take care of the cattle. I delivered them to him. He was to take care of them, salt them; and when I was ready for them he was to deliver them back to me in a corral with a loading chute and guarantee the cattle count or show me the carcasses of the dead ones. Anything that died from natural causes I was to stand if he could show me the carcass. Other than that he was to guarantee the count."

Later, between March 12–15, appellee delivered to Spargo at the Crescent Ranch 278 head of crossbred Brahma steers branded U Bar. Ulmer admits he made no inquiry as to who owned the ranch and that he did not know appellant Shartzer; that Spargo being in possession he "had the idea he owned it." Appellee Ulmer admittedly paid monthly to Spargo the agreed pasturage fee, which in the aggregate amounted to $7,995.55.

On October 1, 1952, appellee contracted for the sale of these Brahma steers, delivery to be made in May 1953. About April 18, 1953, appellee notified Spargo that he wanted delivery of his cattle. April 20th, 46 head were rounded up and shipped without incident. Three days later another herd, bearing various brands, had been rounded up and penned; trucks were there to haul the U Bar steers away when appellant Shartzer appeared upon the scene, parked his jeep in front of the loading chute, and

> "refused to give me (Ulmer) the privilege of shipping. He told me I couldn't haul them. He told the inspector not to inspect them out and the truck driver not to haul them out."

The reason given was that appellant had not been paid the pasture bill due him. It further appears that Spargo had kept all of the moneys paid to him by Ulmer and others and had not paid anything at all to appellant on their rental deal. After this show of belligerence on the part of Shartzer, a Mr. McLeod, representative of the Valley National Bank, opened the gates and turned the penned cattle loose as it was late and there was no feed or water for them at the corral.

It should be noted that during this same period cattle belonging to other parties had been similarly pastured by Spargo and the latter also had some 200 head of his own cattle on the range that were under mortgage to the Valley National Bank.

Appellee Ulmer then went to court and obtained a temporary restraining order under which 59 head of his U Bar steers were shortly rounded up and shipped. Later a writ of replevin was obtained for the other 167 head by posting a bond in the sum of $44,000. Things went from bad to worse, the steers became "wild" and extreme difficulty was experienced in rounding them up. The expense thereof "skyrocketed" and some 31 head were never found. Finally the instant suit, in the nature of an action in conversion—(i. e., for the wrongful, unlawful and wilful acts of defendants in depriving plaintiff of the possession of his cattle)—was brought wherein Ulmer as plaintiff sought damages in the sum of $20,281.25 against both Spargo and appellant for the costs of gathering the cattle; loss of weight; decrease in price, plus the loss of 31 head of cattle. Punitive damages in the sum of $10,000 were also prayed for. The trial court entered judgment for a lump sum of $5,075. After denial of a motion for new trial this appeal was taken. Shartzer's counterclaim for pasturage was dismissed, from which order no appeal was taken, nor did Spargo appeal from the judgments against him in favor of both appellee and appellant.

It appears to be the contention of appellant that the burden was upon appellee, as owner of the cattle in question, to have made an investigation as to who owned the range upon which his cattle were to be pastured, and that appellee having failed to do this he, as owner of the premises, was the holder of a valid agistor's lien upon said cattle for the pasture furnished. Hence appellant maintains he had a right to prevent the removal of said cattle until he had been paid for the pasturage. It should be noted that an agistor's lien did not exist at common law. See, Loader v. Bank of Idana, 113 Kan. 718, 216 P. 264; 2 Am.Jur., Animals, section 22. The lien is therefore statutory, unless created by contract.

There are but two assignments of error. The first challenges the ruling of the trial court in holding that appellant Shartzer did not have a first and prior lien upon all of said cattle under section 62–404, A.C.A.1939 (now Sec. 33–921, A. R.S.). The statute in question, in so far as pertinent, reads:

"62–404. *Lien for feed and pasturage—Sale of stock.*—All persons who *furnish* pasture or feed for any livestock, to be fed on the premises of the person furnishing same, shall have a lien on such stock for the

amount of the charges due and unpaid for same and may take possession of and retain such stock until such charges are paid. * * *" (Emphasis supplied.)

It will be seen that the statute from which we have just quoted gives a lien to those who "furnish" the pasture or feed. The question therefore arises as to who, under the facts above stated, "furnished" the pasture to appellee. Was it Spargo or Shartzer? To "furnish" means to provide or supply. Tacke v. Hauser, 247 Iowa 465, 74 N.W.2d 219, *223*. To decide this question it is necessary to determine the legal relationship between appellant and Tom Spargo. The trial court recognized the problem and answered it in this way:

"The Court * * * believes the defendant, Shartzer, does not have a lien on the cattle of the plaintiff, Ulmer, placed on the premises through an agreement between Ulmer and the defendant, Spargo, Spargo being the tenant of Shartzer. In order for the defendant, Shartzer, to have a lien he would either have to have an agistor's lien or a landlord's lien, or the relationship of bailor and bailee would have to exist between Ulmer and Shartzer.

"The Court does not feel that any of these legal relationships existed and, therefore, the plaintiff should recover."

Under the record here presented we believe the conclusion is inescapable that appellant Shartzer was a lessor and Spargo a lessee with complete possession of the premises. This being true only Spargo could "furnish" the land to appellee Ulmer for pasture purposes. The latter having paid Spargo in full no statutory lien would lie in appellant's favor by the mere fact of nonpayment of rent by Spargo. The trial court was correct in its holding. Unquestionably possession is essential to a lien. See, Loader v. Bank of Idana, supra; Belknap v. Mitchell, 217 Cal. 377, 18 P.2d 929. It is our opinion that the early Montana case of Vose v. Whitney, 7 Mont. 385, 16 P. 846, so strongly relied upon by appellant, is not analogous; most certainly the facts are wholly dissimilar and their statute is also different.

We see no merit to the last assignment of error, which reads:

"That even if the said defendant did not have a lien under this statute above cited, the Court erred in awarding plaintiff damages as a result of losses sustained by plaintiff in rounding up said cattle, that said losses were not the direct and proximate result of the act of the defendant Shartzer who merely verbally stated that he did not want said cattle removed from said premises until his lien had been paid; that any losses sustained by plaintiff were the act of a

184

third person in turning loose, and later rounding up said cattle over which the said defendant Shartzer had no control, and are too remote and speculative to be attributed to any act on the part of the defendant Shartzer."

While it is true there is no evidence that appellant personally opened the gate and turned the cattle out of the corral, nor directed anyone else to do so, yet we hold as a matter of law his acts amounted to a conversion.

"It is settled that conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein. * * *" Gruber v. Pacific States Savings & Loan Co., 13 Cal.2d 144, 88 P.2d 137, 139.

This excellent case points out that plaintiffs are not required to resort to physical violence to remove their property over defendant's opposition thereto, nor need there be an actual manual taking of the property to constitute a conversion thereof which ultimately reacts to plaintiffs' financial detriment. See also, Kee v. Becker, 54 Cal.App.2d 466, 129 P.2d 159, 162.

■ From what has been heretofore said as to the facts it is obvious there is substantial evidence to sustain the trial court's modest judgment awarding damages to appellee for the tort committed by appellant. We hold the trial court was fully justified in impliedly finding that the damages sustained were the natural and proximate consequence of the acts complained of.

The judgment is affirmed.

PHELPS, C. J., and STRUCKMEYER, JOHNSON and BERNSTEIN, JJ., concur.