510 P.2d 400

**AUTOVILLE, INC., an Arizona corporation, et al., Appellants,**

v.

**Phillip FRIEDMAN and Patricia Friedman, his wife, Appellees.**

**No. 1 CA–CIV 1833.**

Court of Appeals of Arizona,
Division 1,
Department B.

May 31, 1973.

JACOBSON, Chief Judge of Division One.

This appeal raises the issue of whether an action for conversion will lie against a used automobile dealership and its stockholders for appropriating the proceeds of sales of automobiles in contravention of a financing agreement.

Plaintiffs-appellees, Phillip Friedman and Patricia Friedman (Friedman) brought an action against defendants-appellants, Autoville, Inc., its two stockholders, Irving Caplan and Joseph Siegel, and their respective wives, and Reserve Insurance Company, an insurance company which issued a bond covering the acts of Autoville pursuant to A.R.S. § 28–1305 (1956). This action sounded in conversion. The matter was tried to the court, sitting without a jury, which, upon findings of fact and conclusions of law, entered judgment in favor of plaintiffs and against the defendants Autoville, Caplan and Siegel and their respective wives, in the sum of $16,550.00 for conversion and against Reserve Insurance Company for $100,000.00 on its bond. Following denial of defendants' post-trial motions, this appeal followed.

In October 1970, Friedman entered into an oral agreement with defendants Caplan and Siegel and their corporation to finance the purchase of used automobiles for the Autoville lot. The trial court, in its findings of fact, found that under the terms of this agreement:

"Plaintiff was to purchase automobiles at wholesale prices and place them on defendants' lot. The title to the purchased vehicles was held in the name of Autoville, Inc. At the time each vehicle was sold, plaintiff was to receive out of the proceeds of the sale the wholesale cost which he forwarded. In addition [Friedman] was to receive a service fee in the amount of $50.00 or $100.00 per vehicle, depending upon whether the wholesale cost was under or over $1,000.00. [Friedman] solicited for the purchase of vehicles, inspected the vehicles, negotiated for the purchase and de-

Richard L. Levin, Phoenix, for appellants.

Leibsohn, Eaton, Gooding & Romley, P. C., by William H. Gooding, Phoenix, for appellees.

livered the vehicles to defendant Autoville, Inc.'s lot."

In addition, the trial court found that the corporation was the *alter ego* of Caplan and Siegel.

Between October 1970 and early January 1971, approximately 59 separate vehicular transactions were consummated under this agreement. In 31 transactions the appellee received his due share of the proceeds in accordance with the agreement. In the other transactions, Friedman neither received the wholesale cost nor the service fee.

Most of the transactions in which Friedman was neither paid nor reimbursed occurred on January 11 and 12, 1971, when defendants Siegel and Caplan liquidated all the vehicles on the lot, deposited most of the proceeds in the corporate account of Autoville, Inc., and immediately withdrew the funds in the form of certified checks payable to the individual stockholders of Autoville, Inc.—Caplan and Siegel.

In addition, Friedman had delivered to Autoville a GMC truck belonging to himself which he authorized Caplan and Siegel to sell for $1,200.00, they being allowed to hold for themselves any sum received over this amount. This truck was also sold and the proceeds pocketed by Caplan and Siegel.

Defendants raised three issues on appeal:

(1) Whether a judgment for conversion was proper under the circumstances;

(2) Whether conversion is an "unlawful act" within the terms of A.R.S. § 28–1305; and,

(3) Whether the evidence supports a judgment against the wives of defendants Caplan and Siegel in their individual capacity.

The defendants do not question the fact that there was reasonable evidence to support the trial court's findings that under the contract between the parties Friedman was "to purchase automobiles at wholesale price and place them on defendants' lot," and "at the time each vehicle was sold, plaintiff was to receive out of the proceeds of the sale the wholesale cost which he forwarded," together with the appropriate service fee. Rather, the defendants question the legal conclusion that the appropriation of these proceeds to their own use amounted to a conversion.

Defendants contend that these findings only support a debtor-creditor relationship between the parties, and that conversion will not lie where there is no obligation upon the debtor to keep intact or deliver to another the specific money in question and the indebtedness may be discharged by the payment of money generally.

The common law tort of conversion was "[the] repudiation of the owner's right or an exercise of dominion over the property, wrongfully, and in denial of or inconsistent with that right; or, as the rule has been otherwise stated, there must be an illegal assumption of ownership." Hull v. Freedman, 383 S.W.2d 236 (Tex.Civ.App. 1964). The gravamen of the tort is therefore the wrongful interference with another's ownership or right of possession. Shartzer v. Ulmer, 85 Ariz. 179, 333 P.2d 1084 (1959); United Bonding Ins. Co. v. Swartz, 12 Ariz.App. 197, 469 P.2d 89 (1970).

At early common law there was some question as to whether money could be the subject of a conversion because of its lack of specific identification. Anno., Property—Subject to Conversion, 44 A.L. R.2d 927 (1955). However, the modern rule, in which Arizona joins, is that money can be the subject of a conversion provided that it can be described, identified or segregated, and an obligation to treat it in a specific manner is established. Markel v. Transamerica Title Insurance Co., 103 Ariz. 353, 442 P.2d 97, cert. denied, 393 U. S. 999, 89 S.Ct. 484, 21 L.Ed.2d 463 (1968).

The question in this case then becomes not whether the proceeds of the sales of automobiles financed by Friedman can be converted, but whether Friedman had such an ownership interest or right of possession in the proceeds of these sales as to

make them the subject matter of a conversion in the first instance.

■ We are of the opinion that the findings of fact of the trial court as to the agreement between the parties do not support such a conclusion as to ownership or possession in Friedman. The trial court found that the agreement between the parties was that Friedman was "to finance the purchase of used motor vehicles for Autoville car lot." Under the terms of that agreement "title to the purchased vehicles was to be held in the name of Autoville, Inc." There was no finding, nor in our opinion would the evidence support such a finding, that Friedman owned or had a right of possession to the vehicles themselves[1] after they were placed on the lot, but prior to their sale. While it is true that Friedman testified that the original agreement contemplated that he would hold title to the vehicles he financed prior to their sale[2], such holding of title, in our opinion, would not have given Friedman an ownership or possessory interest in the vehicles themselves, but was compatible only with a securing of his monetary interest in these automobiles. In this regard, we disagree with Division 2 of this court which held that the mere holding of title to a vehicle as security for an underlying debt places special ownership in the holder which could be subject to a conversion. United Bonding Ins. Co. v. Swartz, *supra*. *See*, Southern Arizona Bank & Trust Co. v. Stigers, 47 Ariz. 31, 53 P.2d 422 (1936).

■ Having found that Friedman had no ownership or possessory interest in the automobiles themselves, how could Caplan and Siegel convert the proceeds of the sale of these automobiles? Friedman relies primarily upon the finding of the trial court that "at the time each vehicle was sold, [Friedman] was to receive out of the proceeds of the sale the wholesale cost which he forwarded" together with his service fee. From this finding the trial court also found that "the proceeds from the sale of the vehicles . . . up to the sum of the wholesale purchase price paid by [Friedman] and his service fee, was the property of [Friedman] at the time said proceeds were received." In our opinion, this is not a finding of fact but a conclusion of law drawn by the trial court from its previous findings as to what the agreement between the parties was, and as such, it is not binding on this court. Gutmacher v. H & J Const. Co., 101 Ariz. 346, 419 P. 2d 525 (1966); Watzek v. Walker, 14 Ariz.App. 545, 485 P.2d 3 (1971).

There is no evidence to show that a portion of the specific sales proceeds were set aside in a special account or otherwise for Friedman. All proceeds were deposited to the general corporate account out of which Friedman was paid. In any event, such a finding of property ownership is inconsistent insofar as the service fee is concerned. Friedman did not "own" any service fee; rather this was an obligation (a debt) owed by Autoville which came into existence only upon the sale of the particular automobile involved.

■ While we agree that the parties contemplated that Friedman was to be reimbursed for his financing and paid a service fee out of the proceeds of the sale of the vehicles, in our opinion, the sale itself was merely the triggering device which brought into existence the obligation of Autoville to pay its debt. This debt was to be paid from the proceeds of the sale, this being the primary source of Autoville's income, but there is no evidence to support a finding that this debt could not have been discharged from a source other than the sale proceeds. In this regard, defendants correctly contend that conversion does not lie to enforce the mere obligation to pay a debt which may be discharged by the payment of money generally. Belford Trucking Co., Inc. v. Zagar, 243 So.2d 646 (Fla.App.1970); Hull v. Freedman, *supra*.

---

1. The one exception to this statement is the GMC truck owned by Friedman and placed on the lot for resale.

2. This portion of the agreement was never carried out and was specifically denied by Caplan and Siegel.

In our opinion, the agreement between the parties merely created the relationship of debtor and creditor.

In summary, we are unable to conclude that Friedman had any ownership or possessory interest in the proceeds of the sale of the various vehicles he financed so as to support an action for conversion against Autoville or its stockholders. This does not mean, however, that Caplan and Siegel, and Autoville as their *alter ego*, are not indebted to Friedman in the amount found by the trial court, and a judgment should be entered against them for this amount based upon money had and received or breach of contract, but not for conversion. *See,* Seekamp v. Small, 39 Wash.2d 578, 237 P.2d 489 (1951).

What we have stated so far applies to all the vehicular transactions between the parties, except the transaction involving the GMC truck. As to this particular vehicle, Friedman owned it outright, and it was not subject to the October 1970 agreement between the parties. This was a separate transaction entered into prior to the financing agreement and was in the nature of a "factoring" agreement whereby Autoville was to sell Friedman's vehicle as Friedman's agent and remit to Friedman a specific sum ($1,200.00). The controlling principle of law for this transaction was well stated in the case of Britton v. Ferrin, 171 N.Y. 235, 63 N.E. 954 (1902):

"Where one intrusts his property to another for a particular purpose, it is received in a fiduciary capacity; and, when turned into money, that is also received in the same capacity. It does not belong to the agent, and he can lawfully exercise no power or authority over it, except for the benefit of his principal, and only as authorized by him. If the agent uses it for his own purposes . . . it is a conversion of that which does not belong to him." 63 N.E. at 956.

We therefore hold that insofar as the proceeds of the sale of the GMC truck is concerned ($1,200.00), Autoville, Caplan and Siegel are guilty of conversion.

This brings us to the liability of Autoville's bonding company, Reserve Insurance Company (Reserve). To what extent is Reserve liable on its bond to Friedman under A.R.S. § 28–1305? This statute states in part that:

"The bond [required of motor vehicle dealers] shall inure to the benefit of any person who suffers loss by reason of any *unlawful* act of the licensee." (Emphasis added.)

The Supreme Court has defined the term "unlawful act" as used in A.R.S. § 28–1305 as "any wrongful act (not involving a breach of contract) for which a civil action will lie." Commercial Standard Ins. Co. v. West, 74 Ariz. 359, 249 P.2d 830 (1952); Phoenix Auto Auction v. State Automobile Ins. Ass'n, 86 Ariz. 337, 346 P.2d 146 (1959); Western Surety Co. v. Clauss, 1 Ariz.App. 224, 401 P.2d 178 (1965).

Since conversion is clearly a "wrongful act" for which a civil action will lie, at least insofar as the sum of $1,200.00 representing the proceeds from the sale of the GMC truck is concerned, Reserve is liable on its bond for this amount. Friedman contends however, that as to the remainder of Autoville's indebtedness, it, and Caplan and Siegel, have been "unjustly enriched", and this "unjust enrichment" is a wrongful act under the statute. However, this same argument can be made as to any debtor who does not pay his creditors—the debtor has been "unjustly enriched" as to the amount of the unpaid debt. This is not the type of "wrongful act" referred to in A.R.S. § 28–1305. As is made clear by Commercial Standard Ins. Co. v. West, *supra*, the breach of a contract (that is, a refusal to pay a due obligation), does not constitute a "wrongful act" within the purview of the statute. As previously indicated, except for the GMC truck transaction, Autoville and its stockholders are only guilty of a breach of contract and, hence, the bonding company cannot be liable on its bond for any amount in excess of the $1,200.00.

As to the wives, there is no evidence that either of them actively participated in the conversion of the GMC truck, although there is evidence that Mrs. Siegel "handled the title work" and "signed a lot of checks of the corporation." Therefore, we find no evidence which would justify a judgment against them as individuals. However, since Autoville, Inc. was operated by Caplan and Siegel as a community venture and since they are liable to Friedman in using the corporate form as their *alter ego*, there exists liability on the part of the wives as members of their respective communities. Reese v. Cradit, 12 Ariz.App. 233, 469 P.2d 467 (1970).

The judgment of the trial court is affirmed in part, reversed in part and remanded for the entry of judgment in favor of Friedman not inconsistent with this opinion.

EUBANK, P. J., and HAIRE, J., concur.