RODERICK DEVELOPMENT INVESTMENT COMPANY, INC., Plaintiff-Appellant, v. COMMUNITY BANK OF EDGEWATER, Defendant-Appellee.

First District (6th Division) No. 1—95—0770

Opinion filed July 26, 1996.

Law Offices of George Segenreich, of Chicago (George Sengenriech and Lisa Thaviu, of counsel), for appellant.

Aronberg, Goldgehn, Davis & Garmisa, of Chicago (Nathan H. Lichtestein, David H. Sachs, and William J. Serritella, Jr., of counsel), for appellee.

JUSTICE EGAN delivered the opinion of the court:

In 1991, the plaintiff, Roderick Development Investment Co., Inc., filed a second-amended complaint against the Community Bank of Edgewater (the Bank); Gertrude Shiner Matanky (Gertrude Matanky), individually and as trustee of the Eugene Matanky Insurance Trust (Trust); and Mark Frighetto. This complaint included a conversion count against the Bank and Frighetto, a Bank officer, to recover funds that the Bank refused to distribute to the plaintiff.

Pursuant to the defendants' motions to dismiss and strike the complaint, the judge dismissed the complaint with prejudice and denied the plaintiff's request to file a third-amended complaint. The propriety of the dismissal of the conversion count against the Bank and Frighetto is the only issue on appeal, and the Bank is the only defendant which is a party to this appeal.

In the complaint, the plaintiff alleged the following. On February 29, 1972, Daniel Dragash entered into an agreement with Eugene Matanky to purchase 5% of the Estes-Paulina Joint Venture (Joint Venture), which was a partnership engaged in the development and operation of an apartment building. Eugene Matanky owned 50% of the Joint Venture and sold Dragash 10% of his interest. Jack Langworthy owned the other 50% of the Joint Venture.

Eugene Matanky's agreement with Dragash, which was attached to the complaint, stated that Eugene Matanky was a partner in the Joint Venture. By buying a portion of Eugene Matanky's interest in the Joint Venture, Dragash did not become a partner in the Joint

Venture, and "his investment [was] subject to [Eugene] Matanky's rights, duties and obligations under the Partnership Agreement."

On July 30, 1974, Eugene Matanky conveyed his interest in the Joint Venture to the Trust, of which Gertrude Matanky was the trustee. On September 25, 1983, Langworthy and the Trust entered into an agreement to sell the Estes-Paulina apartment building to Joel I. Barnett, Inc. (Barnett or the Purchaser). In exchange for the building, Langworthy and the Trust accepted a note or notes from Barnett, under which they would receive periodic payments of principal and interest.

On December 21, 1983, Dragash assigned his share in the Joint Venture to the plaintiff. Apparently, after Eugene Matanky transferred his interest in the Joint Venture to the Trust, Dragash's interest in the Joint Venture was also transformed into an interest in the Trust because, in the assignment to Roderick, Dragash assigned his interest in the Trust rather than an interest in the Joint Venture. Gertrude Matanky's signature on a copy of this assignment, which the plaintiff attached to its complaint, shows that the Trust received a copy of the assignment.

Eugene Matanky's estate and the Trust became indebted to the Bank, and, on August 1, 1984, the Bank entered into an agreement under which it accepted an assignment of proceeds from the apartment building purchase agreement in partial satisfaction of this debt. According to this agreement, which the plaintiff also attached to its complaint, the Trust had assigned 10% of its beneficial interest to Dragash, who had assigned his interest to the plaintiff. The 1984 agreement further provided that, to satisfy their indebtedness to the Bank, the estate and the Trust had agreed to offer the Bank their 50% interest in the purchase agreement, "subject to the interest of Roderick," and the Bank had agreed to accept this 50% interest, "subject to the interest of Roderick." The 1984 agreement further provided that "both parties however, acknowledge the beneficial rights of Roderick to the Real Estate."

According to the 1984 agreement, the Trust and the estate were to direct the Purchaser to make all monthly payments under the purchase agreement to the Bank, and "[f]rom said payments," the Bank was to

> "make the principal and interest payment on the [installment note], make necessary and appropriate tax and/or insurance escrow deposits required in conjunction with the existing first mortgage or the [installment note] and distribute the balance 50% to Langworthy ('Langworthy Net Payment'), 5% to Roderick and 45% to [the Bank]."

The plaintiff further alleged that, between August 1, 1984, and August 1991, the Bank accepted monthly payments from the Purchaser and, pursuant to the 1984 agreement, paid 50% to Langworthy, paid 5% to Roderick and kept the remaining 45% to satisfy the debt.

Shortly before September 30, 1991, Frighetto told Dragash that the Purchaser would be making a final payment under the purchase agreement and that the plaintiff would receive approximately $30,000, its share of these proceeds. Frighetto spoke with Dragash, who at this time was acting as the plaintiff's agent, to arrange for the wire transfer of funds the Bank owed the plaintiff. Frighetto told Dragash that it was unnecessary for the plaintiff to take any action to receive these funds. On September 24, the Purchaser paid the balance under the purchase agreement to the Bank.

On September 30, the Bank sent the plaintiff a letter in which it informed the plaintiff that it would not distribute any portion of the final payment to the plaintiff. The plaintiff attached this letter to its complaint. In the letter, the Bank explained that, on June 15, 1989, the Trust had assigned all of its interest in the proceeds from the purchase agreement to the Bank. Consequently, all funds that had been available to distribute to the beneficiaries of the Trust would be used by the Bank to reduce the debt the Trust and the estate owed.

The 1989 agreement, which was not attached to the complaint but is in the record, states: "The Trust does hereby agree that all proceeds paid to it by [the Purchaser], in excess of $225,724.77 will be paid to [the Bank] to reduce the outstanding indebtedness on the Loan, if it has not already been paid in full." This agreement does not mention the plaintiff's interest in the Trust.

Based on these facts, the plaintiff alleged in count I of its complaint, entitled "Conversion," that any indebtedness of the Trust and the estate was pursuant to an agreement to which it was not a party; it was, however, a third-party beneficiary of the 1984 agreement between the Trust and the Bank, and the Bank breached this agreement by refusing to distribute the purchase agreement proceeds to the plaintiff.

In addition, the

"BANK did knowingly, wrongfully, and illegally assume unauthorized and wrongful control, dominion, and ownership over funds to which Plaintiff had an absolute, unconditional, and immediate right of possession."

The plaintiff made numerous demands to the Bank for its share of the final payment under the purchase agreement, but the Bank refused to remit this share to it. The plaintiff alleged that, by refus-

ing to pay this share to the plaintiff, the Bank converted over $30,000 of its property. It asked for a judgment against the Bank and Frighetto under this count. It asked the judge to order the Bank to account for the funds it received as a result of the final payment and to award the plaintiff 5% of this amount, plus interest.

Count II of the complaint was against the Bank and Frighetto and was based on detrimental reliance. Count III was an unjust enrichment claim against the Bank. Count IV was a breach of fiduciary duty claim against Gertrude Matanky and the Trust. Count V was an unjust enrichment count against Gertrude Matanky and the Trust.

Before the plaintiff filed its second-amended complaint, the Bank, Frighetto and Gertrude Matanky had successfully moved to dismiss the plaintiff's earlier complaints against them. These complaints included claims against the Bank and Frighetto based on conversion, the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq. (West 1992)), breach of fiduciary duty and breach of the duty of good faith and fair dealing.

After the plaintiff filed its second-amended complaint, the Bank and Frighetto moved to dismiss it under section 2—615 of the Illinois Code of Civil Procedure (735 ILCS 5/2—615 (West 1992)). Gertrude Matanky moved to strike the complaint pursuant to sections 2—615 and 2—606 (735 ILCS 5/2—606, 5/2—615 (West 1992)).

Pursuant to these motions, the judge dismissed the plaintiff's complaint with prejudice. During the hearing on the motion, the plaintiff's counsel informed the judge that there was no pending breach of contract claim based on an allegation that the plaintiff was a third-party beneficiary of the contract between the Bank and the Trust. The judge stated that the plaintiff had failed to state a claim for conversion because the money allegedly converted was not an identifiable fund and there was no clear right to the money. The judge also denied the plaintiff's motion to reconsider his dismissal of the conversion count against the Bank and refused to allow the plaintiff to file the third-amended complaint it attached to this motion. The plaintiff's arguments on appeal concern only the dismissal of its conversion claim against the Bank.

■ The only issue raised by a motion to dismiss is whether the facts alleged in the complaint, taken as true, set forth a sufficient cause of action. *Scott Wetzel Services v. Regard*, 271 Ill. App. 3d 478, 648 N.E.2d 1020 (1995). When ruling on a motion to dismiss, courts take all well-pleaded facts as true and construe all reasonable inferences therefrom in the light most favorable to the plaintiff. *Weisblatt v. Colky*, 265 Ill. App. 3d 622, 637 N.E.2d 1198 (1994). Courts must

liberally construe the pleadings with a view toward doing substantial justice between the parties, and no pleading is defective that reasonably informs the opposing party of the nature of the charge against it. *Disc Jockey Referral Network, Ltd. v. Ameritech Publishing*, 230 Ill. App. 3d 908, 596 N.E.2d 4 (1992). A complaint should not be dismissed unless it is clear that the plaintiff can prove no set of facts that would entitle him to recovery. *Reuben H. Donnelley Corp. v. Brauer*, 275 Ill. App. 3d 300, 655 N.E.2d 1162 (1995). The issue before a court reviewing a dismissal of a complaint for failure to state a cause of action is one of law, and, therefore, the standard of review is *de novo. Metrick v. Chatz*, 266 Ill. App. 3d 649, 639 N.E.2d 198 (1994).

■ Conversion is " 'any unauthorized act, which deprives a man of his property permanently or for an indefinite time.' " *In re Thebus*, 108 Ill. 2d 255, 259, 483 N.E.2d 1258 (1985), quoting *Union Stock Yard & Transit Co. v. Mallory, Son & Zimmerman Co.*, 157 Ill. 554, 563, 41 N.E. 888 (1895). The essence of conversion is " 'the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held.' " *In re Thebus*, 108 Ill. 2d at 259, quoting *Bender v. Consolidated Mink Ranch, Inc.*, 110 Ill. App. 3d 207, 213, 441 N.E.2d 1315 (1982). To sufficiently allege conversion, therefore, a plaintiff must allege (1) the defendant's unauthorized and wrongful assumption of control, dominion or ownership over the plaintiff's personal property, (2) the plaintiff's right in the property, (3) the plaintiff's right to immediate possession of the property, absolutely and unconditionally, and (4) the plaintiff's demand for possession of the property. *General Motors Corp. v. Douglass*, 206 Ill. App. 3d 881, 565 N.E.2d 93 (1990).

It is undisputed that the plaintiff made a demand for its share of the final payment under the purchase agreement. The Bank argues, however, that the plaintiff failed to properly plead that it had an unconditional and absolute right to the funds it alleged the Bank converted and that the plaintiff's allegation that it had such a right is contradicted by the exhibits attached to the second-amended complaint. Specifically, the Bank contends that, under the 1984 agreement between the Bank and the Trust, the plaintiff was entitled only to 5% of the net monthly payments and that, since the final payment under the purchase agreement was not a net monthly payment, the plaintiff had no right in it. In addition, the Bank argues that, as the letter from the Bank attached to the plaintiff's complaint indicates, the Trust agreed in 1989 to give the Bank its entire interest in the purchase agreement. Due to this assignment by the Trust, the plaintiff, a beneficiary of the Trust, had no rights in the final payment under the purchase agreement.

In the complaint, the plaintiff contends that it had an unconditional and absolute right to the proceeds, and, in support of its allegation that it had such a right, alleges the following facts. It was the assignee of the purchaser of a 10% interest in the Trust. The Trust entered into an agreement under which the purchaser of property the Trust owned was to pay the Trust in installments. Although the Trust assigned its interest in these payments to the Bank to reduce its indebtedness, the assignment was subject to the plaintiff's interest in the Trust, and the plaintiff received 5% of the net monthly payments under the purchase agreement. The Bank notified the plaintiff that the Purchaser would be making a final payment under the purchase agreement and made arrangements to transfer to the plaintiff its share of this final payment. Taking these facts as true and making all reasonable inferences therefrom in favor of the plaintiff, we believe these allegations were sufficient to show the plaintiff's 5% interest in the Trust and the purchase agreement. From this, we may reasonably infer that the plaintiff had an absolute and unconditional right to 5% of the final payment under the purchase agreement.

Although the 1984 agreement attached to the plaintiff's complaint stated that the plaintiff was entitled to 5% of the *net monthly* payments under the purchase agreement, this does not necessarily contradict its allegations that it had an unconditional right to 5% of the *final* payment. The right to 5% of the final payment may be inferred from the monthly payments it received under the agreement.

The exhibit containing the letter referring to the Trust's 1989 assignment to the Bank also does not necessarily contradict the plaintiff's allegations that it had an absolute and unconditional right in the final payment under the purchase agreement. First, we cannot accept the Bank's assumption, without citation to authority, that Gertrude Matanky had the authority to assign any interest the plaintiff had in the final payment to the Bank in 1989. Also, the fact that the plaintiff continued to receive monthly payments after 1989 implies that the Trust's 1989 assignment did not erase the plaintiff's interest in payments under the purchase agreement.

■ The defendant also asserts that, as a matter of law, an action for conversion may not be maintained for a mere failure to pay money unless it is capable of being described as a specific chattel. *Fonda v. General Casualty Co.*, 279 Ill. App. 3d 894, 665 N.E.2d 439 (1996). Although it is not necessary that the money be specifically earmarked, the money must be a specified identifiable fund. *In re Thebus*, 108 Ill. 2d at 260-62. A right to an indeterminate sum is

insufficient to maintain a cause of action in conversion. *Mid-America Fire & Marine Insurance Co. v. Middleton*, 127 Ill. App. 3d 887, 468 N.E.2d 1335 (1984).

In *In re Thebus*, the supreme court addressed the circumstances under which a plaintiff may maintain an action for conversion of money. It held that an attorney had not converted funds he withheld from his employees' paychecks by failing to pay this money to the Internal Revenue Service. *In re Thebus*, 108 Ill. 2d at 264.

The court explained that, although a specified identifiable fund could be the subject of a conversion action, there could be no conversion action for money represented by a general debt or obligation. In examining the character of the funds the attorney withheld for taxes, the court decided that these were in the nature of a debt to the government rather than an identifiable fund:

"The respondent in our case did not maintain a separate bank account in which the taxes withheld and owed to the Internal Revenue Service were deposited. Likewise, he did not maintain a separate payroll account. Thus, respondent held no identifiable sum of money or fund for the Internal Revenue Service. The money owed to the government did not come into respondent's hands from any outside source. It was an amount that accrued with each pay period as the respondent wrote the payroll checks from his general checking account for the net amount of wages after taxes, retaining in his checking account the difference between the gross wages and the amount of the check." *In re Thebus*, 108 Ill. 2d at 263.

■ Unlike the funds at issue in *In re Thebus*, the funds in this case were identifiable. The amount the plaintiff claims the Bank converted did not accrue but was a determinate amount, 5% of the Purchaser's last payment, which was paid in a lump sum. Also, unlike the amount allegedly converted in *In re Thebus*, the amount the Bank allegedly converted in this case was not merely a portion of its own assets that it was obligated to use to satisfy a debt to the plaintiff. Instead, it was a specific amount transferred to it from an outside source, the Purchaser. In this respect, it was identifiable.

In addition, unlike the relationship of the parties in *In re Thebus*, the relationship between the plaintiff and the Bank was not one of debtor and creditor. As the court explained in *General Motors Corp. v. Douglass*, 206 Ill. App. 3d 881, 565 N.E.2d 93 (1990), a debtor-creditor relationship is created when a party (creditor) transfers his property voluntarily to another (debtor). See also *Fonda*, 279 Ill. App. 3d at 901, 665 N.E.2d at 443-44. In *In re Thebus*, the government became a creditor of the attorney by allowing the plaintiff to collect

withholding taxes for it. In this case, by contrast, there was no debtor-creditor relationship because the plaintiff never voluntarily transferred funds to the Bank. Instead, the plaintiff received funds the Purchaser transferred to the Bank pursuant to an agreement to which the plaintiff was not a party. The fund here was not a debt and was, therefore, subject to conversion.

The situation in the case before us is analogous to cases in which Illinois courts have found conversion actions appropriate. For example, in *Addante v. Pompilio*, 303 Ill. App. 172, 25 N.E.2d 123 (1940), the court held that the defendant converted $3,000 the plaintiff gave the defendant to transmit to his brother in Italy. The defendant failed to transmit this money and used it for his own purposes. The court held that, based on these allegations, the plaintiff's complaint for conversion was proper. *Addante*, 303 Ill. App. at 176.

Similarly, in *Fonda v. General Casualty Co.*, 279 Ill. App. 3d 894, 665 N.E.2d 439 (1996), the court held that the trial court erred in deciding that the plaintiff had failed to prove a conversion. In *Fonda*, the defendant insured a grocery store, which was destroyed by fire. Although it named the plaintiff, who was the owner of a security interest in the store's assets, as a loss payee on the policy, the defendant paid the store owner all of the insurance proceeds and paid none to the defendant, although the store owner owed the plaintiff $20,091.70. *Fonda*, 279 Ill. App. 3d at 897, 665 N.E.2d at 440.

After noting that, to be subject to conversion, money must be capable of being described as a specific chattel, the *Fonda* court decided that the defendant's failure to pay the plaintiff its share of the insurance proceeds from the grocery store, $20,091.70, was conversion. It also apparently accepted the plaintiff's argument that there was no debtor-creditor relationship between the plaintiff and the defendant on the basis that the plaintiff had not voluntarily transferred any money to the defendant. *Fonda*, 279 Ill. App. 3d at 901-02, 665 N.E.2d at 443-44.

As in *Addante* and *Fonda*, the plaintiff in this case alleged that the Bank wrongfully exerted control over a specific amount of money. Based on those cases, in which the courts found a specific sum sufficiently identifiable to support a conversion action, we judge that the plaintiff's conversion claim was proper.

The facts of the case before us are distinguishable from cases the Bank cites in which courts have found conversion actions may not be maintained. Several of these cases have been based on the court's determination that there was a debtor-creditor relationship between the plaintiff and the defendant. For example, in *General Motors Corp.*

*v. Douglass*, 206 Ill. App. 3d 881, 565 N.E.2d 93 (1990), the court held that a conversion action was not appropriate in the case before it because the money was represented by a general debt or obligation. General Motors maintained a "holdback" account for its dealers from which it made periodic payments. It mistakenly paid one of its dealers, the defendant, $37,364.36, although it owed the defendant only $12,836.88. The defendant refused to return the amount General Motors had overpaid it. *General Motors*, 206 Ill. App. 3d at 883.

The court held that there was no conversion because General Motors had created a debtor-creditor relationship between it and the defendant when it voluntarily transferred money to the defendant. *General Motors*, 206 Ill. App. 3d at 892; see also *Mijatovich v. Columbia Savings & Loan Ass'n*, 168 Ill. App. 3d 313, 522 N.E.2d 728 (1988) (rejecting a claim of conversion for funds the plaintiff had voluntarily given to the defendant, thereby creating a debtor-creditor relationship); *Kerwin v. Balhatchett*, 147 Ill. App. 561, 565-67 (1909) (same).

The other cases in which courts have found a failure to establish conversion have been based on the court's conclusion that the plaintiff failed to allege a specific fund. In *Sandy Creek Condominium Ass'n v. Stolt & Egner, Inc.*, 267 Ill. App. 3d 291, 642 N.E.2d 171 (1994), for example, the court held that a verdict in favor of the plaintiff on its conversion count was improper because the money the plaintiff claimed was not sufficiently specific and identifiable. The plaintiff, a condominium association, alleged that the condominium developers had converted funds belonging to the association. These funds included revenue from the laundry room facility, uncollected assessments on association garages and excessive maintenance fees the developers charged the association. The evidence of these allegedly converted funds, however, consisted only of estimations by the plaintiff's expert. The court, therefore, concluded that the plaintiff had failed to prove a specific and identifiable amount of money the defendant owed it. *Sandy Creek*, 267 Ill. App. 3d at 296. See also *Sutherland v. O'Malley*, 882 F.2d 1196 (7th Cir. 1989) (money allegedly converted was indeterminate because it was subject to deductions for the reasonable value of another attorney's services, which amount had yet to be determined); *Eggert v. Weisz*, 839 F.2d 1261 (7th Cir. 1988) (money allegedly converted was treated as a loan and was indeterminate as it was produced from the defendant's sales of the plaintiff's stamps at various times); *South Central Bank & Trust Co. v. Citicorp Credit Services*, 811 F. Supp. 348 (N.D. Ill. 1992) (credit slips were not a chattel subject to conversion because there were conditions on their payment); *Mid-America Fire & Marine Insurance Co. v. Middleton*, 127 Ill. App. 3d 887, 468 N.E.2d 1335 (1984) (the

plaintiff could not maintain an action for conversion of the proceeds of a wrongful death suit; this was an indeterminate sum because it was to be reduced by the plaintiff's share of the costs of the suit, which amount was undetermined).

By contrast, the amount the Bank allegedly converted in this case was not indeterminate but was specific and identifiable. The amount of money the plaintiff alleges the Bank owes is not estimated. Rather, it is exactly 5% of the final payment under the purchase agreement. Although the Bank argues that this sum is indeterminate because the plaintiff alleged only a percentage, we do not think it is fatal to the plaintiff's claim at this stage of the proceedings, especially considering the plaintiff's request in its complaint for an accounting to require the defendant to disclose the amount of the final payment.

The Bank also contends that the amount claimed by the plaintiff was not identifiable because it was not segregated or required to be kept in a separate account. The Bank relies on *General Motors, In re Thebus* and *Rasmussen v. Sports Media Sales, Inc.*, 691 F. Supp. 153 (N.D. Ill. 1988).

We do not think that *General Motors* and *In re Thebus* stand for the proposition that an action for conversion of money may never be maintained unless the money is placed into a separate account. This was just one factor the courts in these cases considered in determining whether a conversion action could be maintained. The *General Motors* decision rests on the fact that the plaintiff gave the defendant the money voluntarily rather than on the defendant's failure to place it in a separate account. Similarly, the *In re Thebus* decision was not based only on the attorney's failure to segregate the amounts he withheld; the court also considered the fact that this money could not be distinguished from his other funds because it had not come from an outside source.

Although the court's decision in *Rasmussen* that a conversion action could not be maintained was based on the fact that the allegedly converted funds were not identifiable because they were not placed into a separate account, this is a federal trial court opinion, and we believe it places more importance on the segregation factor than cases decided in our own courts of review. In addition, we note that there was a debtor-creditor relationship in *Rasmussen* that was similar to the one in *In re Thebus*. The plaintiff in *Rasmussen* had agreed to allow the defendant to collect revenues and to remit the plaintiff's portion of these revenues to the plaintiff. See *Rasmussen*, 691 F. Supp. at 154.

In this case, where the allegedly converted funds did come from

an outside source, the failure to segregate does not make them unidentifiable and, therefore, not subject to conversion. As the plaintiff argues, there is an element of unfairness in a rule that prohibits a conversion action for funds that are not segregated. Such a rule gives the alleged converter control over whether certain funds are subject to conversion because, depending on the type of account in which he chooses to place the funds, the funds may or may not be considered identifiable and, therefore, may or may not be subject to conversion. A party, such as the plaintiff, with no contractual relationship with the alleged converter could not dictate the manner in which the funds were held.

Although some courts in other states continue to require funds to be segregated in order to be the subject of a conversion action (see, e.g., *Rupp v. Schon*, 608 So. 2d 934 (Fla. App. 1992)), we are persuaded by the reasoning of the courts in states that recognize that converted funds may be identifiable in other ways. The Alabama Supreme Court, for example, has stated:

" 'Money in any form is generally regarded and treated as property, and it is well settled that an action will lie for the conversion thereof, where there is an obligation to keep intact and deliver the specific money in question, and where such money can be identified. ***

The requirement that there be "earmarked money or specific money capable of identification" before there can be a conversion has been complicated as a result of the evolution of our economic system.

Now, in conversion cases, the courts are not confronted so much with a particular piece of money, i.e., a coin or a bill, but with identified or segregated sources from which money has come or types of accounts into which money has been deposited.' " *Greene County Board of Education v. Bailey*, 586 So. 2d 893, 898 (Ala. 1991), quoting *Lewis v. Fowler*, 479 So. 2d 725, 726 (Ala. 1985).

Similarly, the court of appeals of Arizona has stated:

"[T]he modern rule, in which Arizona joins, is that money can be the subject of a conversion provided that it can be described, identified or segregated, and an obligation to treat it in a specific manner is established." *Autoville, Inc. v. Friedman*, 20 Ariz. App. 89, 91, 510 P.2d 400, 402 (1973).

These cases indicate that money may be identified not only by segregation but also by its source or description. In this case, the allegedly converted funds were adequately identified by description, 5% of the final payment under the purchase agreement, and their source, the payment transferred to the Bank.

In a case with facts very similar to the ones in the case before us,

*Coffee County Bank v. Mitchum*, 634 So. 2d 148 (Ala. Civ. App. 1993), the court held that funds were identifiable by their source, despite the fact that they had been deposited in the defendant's general operating account. In *Coffee*, a motor home dealership had agreed to sell the plaintiff's motor home. After selling the motor home, the dealership deposited the proceeds into its general operating account with the bank's knowledge that the funds had a "special purpose." That is, they were intended to pay the plaintiff for his motor home. Nevertheless, the bank applied the money to the indebtedness of the dealership. The court held that the money was sufficiently identifiable to support a conversion claim because it could be clearly identified from the source from which the money was acquired. *Coffee*, 634 So. 2d at 151.

In another case similar to the one before us, a Georgia appellate court found conversion based on a defendant's failure to transfer money given to it for a specific purpose. In *Unified Services, Inc. v. Home Insurance Co.*, 218 Ga. App. 85, 460 S.E.2d 545 (1995), the court of appeals of Georgia held that the plaintiff could maintain a conversion action for premiums a broker failed to remit to an insurer. Although the broker had billed the client for the premiums, it failed to transfer the premiums to the insurer on behalf of the client. (It is unclear whether the broker kept these premiums in a separate account.) The court held that the premiums were sufficiently identifiable to be the subject of a conversion action because they were "earmarked" for remittance to the insurance company. *Unified Services*, 218 Ga. App. at 89-90, 460 S.E.2d at 549, citing *DCA Architects v. American Building Consultants*, 203 Ga. App. 598, 417 S.E.2d 386 (1992) ("directed verdict on conversion claim reversed where subcontractor was entitled to certain percentage of fees collected by contractor on specified projects and contractor collected fees but failed to pay subcontractor"). As in *Unified Services*, the plaintiff alleges in this case that the Bank converted funds that were "earmarked" for remittance to the plaintiff.

In still another analogous case, *Ferguson v. Coronado Oil Co.*, 884 P.2d 971 (Wyo. 1994), the Wyoming Supreme Court held that the defendant had converted the plaintiff's percentage of net profits from an oil field. The court rejected the defendant's argument that this percentage was not sufficiently identifiable, tangible or segregated to be subject to conversion. The court stated that the precise amount owed to the plaintiff was easily identifiable at the time it was due and, at that moment, the defendant had an obligation to deliver it in a specific manner. *Ferguson*, 884 P.2d at 978. Similarly, the 5% the Bank allegedly converted in this case was easily identifiable at the

time the Purchaser made the final payment under the purchase agreement, and, according to the plaintiff's complaint, the Bank had an obligation to deliver it in a specific manner.

Based on our examination of the treatment of conversion claims for money in Illinois and in other states, we believe that the plaintiff's complaint was sufficient to state a claim for conversion against the Bank. Consequently, we hold that it was improperly dismissed and remand it for further proceedings.

Judgment reversed and cause remanded.

ZWICK, P.J., and RAKOWSKI, J., concur.