**LaSALLE BANK LAKE VIEW, an Illinois banking corporation, Plaintiff,**

v.

**Ellen SEGUBAN, Rafael Seguban and John DOE, Defendants.**

No. 93 C 5949.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 23, 1996.

Barry Alan Miller, Michael L. Shakman, Edward W. Feldman, Bernard A. Schlifke, Miller, Shakman, Hamilton, Kurtzon & Shlifke, Chicago, IL, for LaSalle Bank Lake View.

Brent Douglas Stratton, Jenner & Block, Chicago, IL, Patrick Alan Tuite, Arnstein & Lehr, Chicago, IL, for Ellen Seguban.

### OPINION AND ORDER

NORGLE, District Judge:

Before the court is the renewed motion for summary judgment of Plaintiff LaSalle Bank Lake View ("Bank"). For the following reasons, the motion is granted in part and denied in part.

### I.  Background [1]

The Bank brings this suit against Ellen Seguban ("E. Seguban") and Rafael Seguban ("R. Seguban") pursuant to the Racketeer

---

1. The following facts are drawn from the Bank's Local Rule 12(M) statement, as both Segubans have failed to file Local Rule 12(N) statements. *See* Procedural History, *supra.*

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, including supplemental state claims for breach of fiduciary duty, conversion, and fraud. The Bank alleges that E. Seguban, its former Assistant Teller Manager, conducted a series of fraudulent transactions which divested the Bank of $940,000 over a twelve-year period between 1981 and 1993. The Bank also alleges that R. Seguban, E. Seguban's husband, accepted and used funds which he knew had been illegally taken from the Bank by his wife.

### A. Procedural History

The Segubans claim that a criminal investigation is currently proceeding against both Segubans.[2] In response to the Bank's discovery requests throughout litigation of the instant civil suit, the Segubans invoked their Fifth Amendment privileges against self-incrimination and did not answer the Bank's attempts at discovery. At both the original summary judgment phase of this litigation and the instant renewed summary judgment phase, the Segubans did not file a Local Rule 12(N) statement answering the Bank's 12(M) statement.

On the original summary judgment motion, this court granted summary judgment in favor of the Bank in a previous opinion and order. *See LaSalle Bank Lake View v. Seguban*, 851 F.Supp. 336, 340 (N.D.Ill.1994). In so doing, the court stated that (1) the Segubans' failure to file a Local Rule 12(n) statement deemed admitted the facts contained in the Bank's 12(m) statement;[3] (2) the court drew a negative inference from the Seguban's assertion of the Fifth Amendment in this civil case; and (3) in light of the preceding, there was no material issue of fact for trial. *Id.*

■ That judgment was reversed and remanded by the United States Court of Appeals, Seventh Circuit. *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 394 (7th Cir.

1995). The opinion of the Seventh Circuit states,

> Rule 12(N), which deems admitted un-rebutted Rule 12(M) facts that *are* evidentiarily supported, does no more than operationalize an inference that could in any event be reasonably drawn from Fifth Amendment silence in the face of such evidence—that the facts it reveals are true.

*Id.* at 391 (emphasis original). This inference alone does not lead to the entry of summary judgment, but simply establishes the facts upon which summary judgment analysis will proceed. *Id.* at 392. It was the analysis by this court which the Seventh Circuit found inadequate on appeal. Further, the Seventh Circuit opinion raised two legal issues, which it left to the consideration of this court: (1) whether the Bank, as a victim of an alleged RICO violation, could also be the "enterprise" through which the Segubans accomplished that violation, and (2) whether E. Seguban had sufficient control over the "operation or management" of the Bank to have caused such a violation. *Id.* at 393. This court reviews the Bank's renewed motion for summary judgment in light of the Seventh Circuit's observations.

### B. Underlying Facts

The Bank states that E. Seguban created fictitious credit and debit transactions which rendered undetectable her many unauthorized cash withdrawals from the Bank's vault. She allegedly did so by taking advantage of an opportunity in the system used by the Bank to monitor cash flow in and out of its vault. The system consisted of various "checks and balances." Each time a bank teller received cash from the vault, the teller and the vault supervisor executed corresponding credit and debit receipts, known as "teller tickets." At the close of each day, the vault manager and the tellers submitted their

---

**2.** At the appellate level, the United States Court of Appeals Seventh Circuit noted that the Segubans had not moved this court to stay this civil action pending resolution of their criminal case. They still have not done so. It appears that the criminal matter is still proceeding in state court.

**3.** The original motion for summary judgment was filed prior to the effective date of the revised

Local Rules 12(M) and 12(N), April 4, 1994. Thus, the court employed the unrevised Local Rules 12(m) and 12(n) for purposes of that motion. The instant renewed motion was filed after the effective date of the revised rules, and the revised Local Rules 12(M) and 12(N) will be used in deciding the renewed motion.

teller tickets for entry into the Bank's records. Because corresponding credit and debit teller tickets arrived in separate batches from the vault and teller departments, they were processed separately. After approximately three days, if credit and debit receipts did not balance, the Bank's internal security controls were triggered and the unmatched transactions were investigated. The Bank states that, in September 1993, it discovered a discrepancy in the teller tickets which led it to investigate the transactions on the tickets in question.

The Bank questioned E. Seguban, who admitted to disguising fraudulent transactions by executing false teller tickets approximately every three days over a twelve-year period. E. Seguban also confirmed that she prepared the false teller tickets which triggered the Bank's internal investigation. She signed a statement to the effect that she did so in order to conceal a fraudulent transaction made by a former bank manager, identified only as "John Doe." She refused to disclose his "true" identity. The Bank's investigation revealed that E. Seguban's story about "John Doe" was false.[4] The Bank also discovered that E. Seguban had diverted increasing amounts of money through each fraudulent transaction. The investigation revealed that she diverted a total of $940,000. The fraudulent transactions went undetected during the twelve-year period because, in her supervisory capacity, E. Seguban created new false teller tickets, totalling the full amount taken, every three days over that period, thus evading the Bank's three-day internal control trigger.

The Bank alleges that R. Seguban aided and abetted E. Seguban's embezzlement scheme. According to the Bank, R. Seguban knew that his wife was embezzling funds from the Bank over many years. Those funds were used to finance a family lifestyle which required far more than the Segubans' combined reported annual income of approximately $50,000.

The Bank claims that E. Seguban violated 18 U.S.C. § 1344 by knowingly executing a scheme (1) to defraud a financial institution, or (2) to procure funds under the custody of a financial institution by means of fraudulent pretenses, representations, or promises. Such a violation amounts to "racketeering activity" as defined by 18 U.S.C. § 1961. As it alleges that E. Seguban engaged in several acts of such racketeering activity over approximately twelve years, the Bank states that she engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961. The Bank also alleges that E. Seguban is a "person" possessing the ability to operate or manage the Bank's business within the meaning of 18 U.S.C. § 1961. The Bank contends that it is an "enterprise" within the meaning of § 1961(4). Consequently, the Bank asserts that E. Seguban violated 18 U.S.C. § 1962(c) by conducting a pattern of racketeering activity via her employment at the Bank. The Bank claims resulting injury to its business or property in the amount of at least $940,000 of its funds.

The Bank requests an award of treble damages and attorney fees from E. Seguban. In addition, the Bank claims that the Segubans conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). Therefore, the Bank asserts that both are jointly and severally liable for treble damages and attorney fees pursuant to 18 U.S.C. § 1964(c).

The Bank's first supplemental state claim asserts that E. Seguban breached her fiduciary duties of loyalty, honesty, and fair dealing to the Bank. The Bank also claims that R. Seguban knew of, encouraged, and solicited her embezzlement of the funds. Thus, according to the Bank, he is jointly and severally liable. Further, the Bank states claims for conversion and fraud against the Segubans.[5]

In support of its 12(M) statement, the Bank submits the following:

---

4. E. Seguban's attorney later stated in open court at a status hearing that "John Doe" does not exist. The court notes that liability for the alleged violations does not turn on his existence.

5. As it did in granting the Bank's original motion for summary judgment, the court notes that a plaintiff seeking redress for a single injury under multiple theories of recovery may only recover once. *See Bragado v. City of Zion/Police Dept.,* 839 F.Supp. 551, 555 (N.D.Ill.1993).

- **E. Seguban's Answer to the Complaint, which exercises E. Seguban's Fifth Amendment privilege in lieu of answering the substantive allegations of the Complaint.** E. Seguban's Answer does admit that she worked for the Bank for twenty years, until September 1993, and that she was the Assistant Teller Manager From February 1992 to September 1993. The Answer also admits that Seguban is a "person" within the meaning of 18 U.S.C. § 1961(3).

- **The affidavit of Toni Stanek, Vice-President of the Bank since January 1994.** Stanek's duties at the Bank include performing market valuations of real estate proposed as collateral for loans made by the Bank. Stanek inspected the Seguban's two-family home to estimate its market value. The second floor apartment was occupied by E. Seguban's parents, and the first by the Segubans. Stanek describes a "marked disparity" in the condition of the two units. Unlike the second floor, the first floor was "rehabbed," with a remodeled and upgraded kitchen. The living room contained a large-screen (forty-three inch) television and newer furniture. The bedroom closets and basement contained an "extremely large amount of clothing." Approximately sixty percent of the basement was used for clothing storage and included a segregated area containing hanging racks filled with clothing. There were numerous boxes containing unidentified items stacked in the kitchen pantry (which measured four feet by eight feet), two of the bedroom closets, and the basement. The property had been improved by a newer, high efficiency boiler with a water circulating pump servicing the radiator system. The building had a high capacity water heater. Each of the two apartments had window air conditioners. There were three new circuit breaker panels, one for each floor and the basement. It appeared to Stanek that the property had been partially rewired. The property also had an electronic security system controlled by a touch pad in the front

hallway. E. Seguban refused to allow Stanek to inspect the outside rear of the property or the two-car garage located at the rear of the property.

- **Two affidavits of George Malekovic, the Bank's Assistant Vice President—Security.** As part of his job, Malekovic is responsible for reviewing Bank policies and procedures, and for investigating instances of possible employee misconduct. Malekovic's affidavit sets forth in detail the teller ticket procedure summarized *supra*.

In September 1993, Sonia Vargas, the Bank's Operations Officer, brought to Malekovic's attention a discrepancy in a series of teller tickets. The tickets were irregular, as the dates on the face of the tickets varied, but the dates of processing (shown by a stamp on the back of the tickets) were the same and the processing numbers were consecutive. This indicated that the tickets were not created in the ordinary course of business. Malekovic took the tickets to the Teller Manager, Eneida Feliciano, asking her to explain the discrepancy. Feliciano subsequently asked all teller supervisors and the Bank's Assistant Manager to explain in writing the operation of the vault and teller tickets.

Feliciano called Malekovic on September 16 and told him that E. Seguban admitted engaging in improper activity relating to the transfer tickets. Malekovic met with Feliciano and her supervisor, to discuss E. Seguban's apparent activity. Before Malekovic spoke to E. Seguban, Feliciano asked E. Seguban to write out a statement, describing what had happened. She did so before speaking to Malekovic.[6]

Afterwards, Feliciano brought E. Seguban to the Bank's board room so that Malekovic could interview her. Feliciano was present during the interview. At the beginning of the interview, E. Seguban gave the written statement to Malekovic.

---

6. The Bank submitted a copy of the statement, set forth *supra*.

E. Seguban told Malekovic that a manager of the Bank's Lincoln Park facility approached her in 1980 or 1981 with a certificate of deposit and asked her to process it. At the time, E. Seguban was a teller at that location. E. Seguban said that she had held the ticket because she did not know how to process it, as she would have been out of balance. Although she did not expressly say so, Malekovic understood her to mean that the manager did not submit cash to pay for the certificate.

E. Seguban then told Malekovic that she decided to process the certificate by writing fictitious names on teller tickets in order to process the transaction through the Bank without drawing attention to it. To prevent the Bank from discovering the false teller tickets, E. Seguban wrote a new teller ticket every few days for a period of several months. The new tickets created book entries which cancelled-out the earlier tickets. Provided that the new tickets were submitted every three days and totalled the same amount, the Bank's internal controls did not detect the false transaction. Several months after the initial transaction, the manager who had ordered her to process the ticket was terminated, without detection of his scheme. E. Seguban stated that she could not recall the amount of the false teller ticket at that time.

E. Seguban told Malekovic that, after the manager was fired, she held the false teller ticket for one week. She then decided that she could not report the manager's improper conduct and her cover-up, because she feared losing her job. Therefore, she decided to break-up the one large teller ticket into a series of smaller tickets.

E. Seguban then told Malekovic that she maintained the same false teller ticket balance for the following twelve years. She told him that she never increased the amount taken, and that she never personally received any of the money. She submitted new false teller tickets every three days for twelve years.

E. Seguban refused to identify the manager who supposedly told her to process the false transaction.

When Malekovic asked E. Seguban how she managed to submit the false teller tickets during vacations and an extended maternity leave, she responded that she would prepare batches of teller tickets in advance. Either E. Seguban or her daughter would deliver them to the Bank and tell a Bank employee that E. Seguban was working on a special project and that the tickets had to be processed. In addition, she had given groups of tickets to a teller in advance, directing the teller to hold the batches and process them on specified days.

E. Seguban also told Malekovic that, during the twelve-year period, she put approximately $10,000 of her own money into the Bank as a partial repayment for the money that was missing. She stated that, after the first several years of the scheme, she determined that she would take the blame for the entire scheme, and that she did not wish to get anyone else in trouble.

At the end of the interview, Malekovic asked E. Seguban to sign her previously-written statement, which she did in Malekovic's presence.

Since that time, Malekovic has worked with Frederick Hausmann, the Bank's Assistant Vice President—Assistant Controller, in reviewing the Bank's records. Their review—described more fully in Hausmann's affidavit—demonstrate's the falsity of E. Seguban's statement that the amount of her fake transaction had remained the same for twelve years. In 1986, the amount of money taken from the Bank could not have exceeded $540,000. During the period from June 1992 to February 1993, the amount increased from approximately $874,000 to $940,000.

Malekovic examined the Bank's personnel file and other records concerning E. Seguban. In addition to being the Assistant Teller Manager responsible for thirty-seven tellers from February 1992 to September 1993, E. Seguban was a

Teller Supervisor from 1979 until February 1992. As of September 1993, her annual salary was $25,600. Before that time, her salary was lower.

- **Exhibit "A" to Malekovic's affidavit: the hand-written and signed statement of E. Seguban.** That statement reads as follows:

  Back in 1980–81, transaction involving CD's and teller transfer ticket was processed by me. A mistake happened which need to be corrected. I was left with a teller transfer ticket w/o an offset. When I approach the individual who gave me the transaction I was told they'll get around to it. The individual was terminated and I did know what to with the items. Thinking that I was going to be let go if I brought this up then, I just replace the tickets in order to have an updated date. I continue doing this. Ellen Seguban [signature]

- **The affidavit of Feliciano, Teller Manager for the Bank from 1990 to August 1995.** Feliciano worked with and supervised E. Seguban. Feliciano outlines the duties held by E. Seguban in her position as Assistant Teller Manager: overseeing teller services operations— the regular teller line (processing routine customer transactions) as well as the special services teller line (processing commercial transactions and collections); supervising three teller supervisors to whom fifteen to twenty tellers reported; ensuring that the Bank's teller system complied with audit requirements; ensuring that customers were served properly; approving work and vacation schedules for tellers and supervisors; ensuring that there was sufficient cash in the teller drawers and in reserve; hiring and firing tellers; researching customer complaints about discrepancies; and overseeing the issuance of traveller's checks, ATM cards, and cashier's checks.

Moreover, E. Seguban had authority not only to create or approve teller ticket transactions, but also to direct those working under her to process teller tickets which she created.

Before she became an Assistant Teller Manager, E. Seguban was a Teller Supervisor. As such, she was responsible for supervising fifteen to twenty tellers, and for aiding the Assistant Teller Manager in the execution of the duties described above. At that time, too, she had authority to create or approve transactions reflected on teller tickets and to direct those working under her to process teller tickets prepared by her.

- **Three affidavits of Frederick Hausmann, the Bank's Assistant Vice President—Assistant Controller.** The affidavits state that Hausmann is an experienced Certified Public Accountant who is particularly familiar with the Bank's teller ticket procedure. Hausmann worked with Malekovic in the investigation of E. Seguban's suspected conduct.

Hausmann reviewed computer printouts of teller tickets created in the time period from June 1992 to September 1993. From that review, Hausmann has determined that, during the period, E. Seguban manipulated the teller ticket process to create records for non-existent transactions. In June 1992, she was processing false teller tickets in the amount of $874,000. In February 1993, she was processing $940,000. The total of the false transactions increased on eighteen separate occasions, typically by amount of approximately $2,000 to $7,000. Hausmann states that the varying amounts on the teller tickets (i.e., a series of tickets totalling $900,000 rather than one $900,000 ticket) assisted E. Seguban in avoiding detection, as the amounts were not so large in the ordinary course of the Bank's business to draw attention to them.

The slow increase of the balance in the teller ticket account also aided E. Seguban in delaying detection. A sudden increase would have likely caused immediate action.

Hausmann also thoroughly describes the teller ticket process.[7] He further states that, in some cases, when a teller would transfer money to the reserve vault and issue a teller ticket, E. Seguban would apparently issue a corresponding teller ticket for the full amount, but would not deposit all of the money into the vault. If she had actually deposited the money, she would have had to issue a "cash in" ticket. There were no "cash in" tickets corresponding to the false transactions. Instead, E. Seguban diverted the cash. If she had created "cash in" tickets, the diversion of money would have been discovered at the end of the day on which the diversion occurred, when the cash was counted. The amount of cash in the vault would not equal the total of the "cash in" tickets.

Hausmann also reviewed the Bank's records beginning in 1986.[8] In December 1986, the records show that the total outstanding amount in the teller ticket account was approximately $540,000. Because of the nature of her scheme, the amount diverted by E. Seguban could not have exceeded that $540,000.

Hausmann attaches sample corresponding teller tickets from the false transactions which show the date the tickets were processed. Those particular tickets show debits and credits which constitute one rollover of the total amount. The credit tickets offset previous debit tickets totalling $940,000. In order to issue the credits to process the prior debits, E. Seguban issued new debit tickets totalling the same amount, but in different amounts. This rolled over the entire transaction for three more days. The dates on the face of the tickets are different. However, the sequence numbers on the back of the tickets show that the tickets were processed consecutively. This demonstrates that they were submitted for processing simultaneously. This leads to the inference that the tickets were not prepared on the dates indi-cated on their faces and were not prepared in the ordinary course of business. Hausmann has reviewed the Bank's records and can find no legitimate Bank transactions to which the tickets correspond.

Attached to Hausmann's Supplemental Affidavit is a schedule which summarizes the data he obtained from the documents. That schedule shows that from February 11, 1985, through February 26, 1993, E. Seguban increased her balance from $170,000 to $940,000. After February 26, 1993, and until her termination that September, E. Seguban continued to roll over the balance of $940,-000 without increasing the balance.

● **Documents from Craigin Federal Savings & Loan Association, produced pursuant to subpoena, regarding the Seguban's mortgage.** The documents show that the Segubans paid a purchase price of $70,000 for their home in 1987, taking out a $35,000 mortgage.

The Residential Loan Application shows a combined monthly income for the Segubans of $3,397. The Segubans stated that they owned a 1984 Mazda GLC valued at $3,000 and a 1986 BMW valued at $20,000. E. Seguban listed $35,000 in profit sharing funds from the Bank, which were to be used as the downpayment on the house.

● **Portions of the deposition of Marly J. Solivan, E. Seguban's sister.** Solivan testified that the Segubans told her about real estate that they purchased in Florida "on installment" for "something like" $7,000. Solivan did not know where E. Seguban was getting the money to pay the installments.

Solivan also testified that the Segubans owned five or six automobiles: an "old model" Mercedes–Benz, an "old model" BMW, a Dodge Caravan mini-van, an Oldsmobile Bravada, and a Nissan Sentra (on which Solivan thought the Segubans' daughter made the payment).

---

7. As the explanation is technical and the parties do not dispute it, the court will not again detail the process.

8. Records regarding teller ticket transactions before August 20, 1986, have been destroyed in the ordinary course of the Bank's business.

When Solivan asked E. Seguban how they paid for the automobiles, E. Seguban said that they made installment payments.

Further, Solivan testified that the Segubans would go to Disney World every year with their children. Also, they went to Europe once with their children. The Segubans have four children.

Solivan stated that the Segubans paid approximately $2,000 for their share of a fiftieth wedding anniversary party for their parents at the Chicago Hilton Hotel.

Solivan testified that she helped the Segubans prepare their income tax returns every year. Neither of the Segubans ever told Solivan of any income other than that appearing on their federal W–2 employer forms and their federal 1099 forms.

The Segubans' children attend the following schools: one attends Columbia College, one Loyola University, and two attend Montessori.

- **E. Seguban's Response to Plaintiff's Request for Production of Documents.** The Response indicates that E. Seguban will not produce documents relating to her finances, as she is exercising her Fifth Amendment rights.

- **A letter from R. Seguban's attorney, dated November 19, 1993.** The letter states that R. Seguban also asserts his Fifth Amendment right to silence.

- **A letter from R. Seguban's attorney, dated December 20, 1993.** The letter was written in response to a proposed preliminary injunction restraining the use of the Seguban's assets. The letter states that R. Seguban's attorney was "aware that some funds which may have been spent by Mr. Seguban may have been the proceeds of a bank fraud. Consequently, Mr. Seguban has no objection to submitting to the constraints on his assets ... but he is unwilling to admit any wrongdoing in connection with the taking or spending the money in question."

## II. *Discussion*

■ Summary judgment is appropriate only where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *GCIU Employer Retirement Fund v. Chicago Tribune Co.*, 66 F.3d 862, 864 (7th Cir.1995). The moving party carries the initial burden of identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Once the movant satisfies its burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

■ Where the nonmovant does not set forth such specific facts in a Local Rule 12(N) statement, the movant's Rule 12(M) statement is deemed admitted. *Seguban*, 54 F.3d at 389. At that point, the court must examine the movant's facts to determine whether the movant has demonstrated that it is entitled to judgment. *Id.* at 390. Where the failure to file a 12(N) statement arises from an assertion of Fifth Amendment rights, that assertion may give rise to a negative inference, only when considered in conjunction with other evidence, and assertion of those rights alone cannot be taken as an admission of guilt. *Id.* The movant will prevail only where "the record taken as a whole could not lead a rational trier of fact to find for the [nonmovant]...." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). At summary judgment, courts may consider only evidence which would be admissible at trial under the Federal Rules of Civil Procedure. *Whitted v. General Motors Corp.*, 58 F.3d 1200, 1204 (7th Cir.1995).

### A. Evidence of Wealth

■ The Segubans argue that the Bank exaggerates their lifestyle, and that the Bank's evidence of their lifestyle cannot support the Bank's claim. Evidence of wealth

may lead to an inference that a person participated in a cash-intensive criminal enterprise, and evidence that income is not reported to the IRS "suggests that he [or she] knew that the payments were unlawful." *Cf. United States v. Hogan*, 886 F.2d 1497, 1507 (7th Cir.1989); *United States v. Wilson*, 715 F.2d 1164, 1171 (7th Cir.1983).

The Segubans state that the Bank established only that they earned $50,000, purchased a $70,000 home with a $35,000 mortgage, took a $7,000 trip to Disney World "with no evidence of who paid for the trips and the purchase of five automobiles with no details as to the cost or financing of the vehicles and the attendance of the Segubans' children at private schools without any evidence of the cost of the education or whether they received any financial assistance." (E. Seguban's Resp. at 4.)

■ The court does not accept this statement as an assertion that others paid for the trip and the tuition. In exercising their Fifth Amendment rights, the Segubans have chosen not to assert facts beyond those presented by the Bank. *See S.E.C. v. Zimmerman*, 854 F.Supp. 896, 899 (N.D.Ga.1993) ("The Fifth Amendment privilege cannot be invoked to oppose discovery and then tossed aside to support a party's assertions. *McGahee v. Massey*, 667 F.2d 1357, 1362 (11th Cir.1982); *In re Edmond*, 934 F.2d 1304, 1308 (4th Cir.1991). A defendant faces the dilemma of choosing silence or presenting a defense. *United States v. Rylander*, 460 U.S. 752, 759, 103 S.Ct. 1548, 1553–54, 75 L.Ed.2d 521 (1983); *Williams v. Florida*, 399 U.S. 78, 83–84, 90 S.Ct. 1893, 1896–97, 26 L.Ed.2d 446 (1970).") The court notes that the Segubans may, however, argue that the Bank's evidence does not adequately support its allegations.

Further, the Segubans argue that the Bank has not proven that they lived beyond their means. The court notes, however, that the Segubans have chosen not to offer any explanation for the evidenced expenditures, including those listed above, as well as the party, rehab work on the home, television, and trip to Europe. Only with disclosure

could the Bank prove their expenses "to the penny," rather than simply provide evidence of sample expenditures.

The Segubans hold the key to any financial explanations there may be. They have, as they are entitled to, chosen not to respond to accusations regarding the source of their expenditures. Their silence alone cannot lead to the conclusion that they lived beyond their means unlawfully. However, in the face of the Bank's evidence demonstrating that the Segubans indulged in multiple expensive purchases, their choice not to reveal the source of their expenditures may lead to the inference that they did so. *See Seguban*, 54 F.3d at 390. Whether the totality of the evidence presented, including inferences from the evidence of wealth, dictates that the Bank is entitled to summary judgment is discussed below.

### B. RICO

RICO makes unlawful various types of infiltration of interstate business "enterprises" through a "pattern of racketeering activity." 18 U.S.C. § 1962. Subsections (a), (b), and (c) of § 1962 delineate substantive violations; § 1962(d) prohibits involvement in a conspiracy to violate those first three subsections; § 1964 authorizes civil suits based on § 1962 violations. *Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 958 (7th Cir.1996).

■ Civil RICO plaintiffs must demonstrate the existence of seven elements of a RICO violation:

(1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.

*Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983). Further, plaintiffs must show that they were injured in their business or property by reason of the RICO violation. 18 U.S.C. § 1964(c).[9]

9. The parties do not argue about elements (1), (2), or (7), nor do they dispute that the Bank

suffered a $940,000 injury. Thus, the court will not address those issues.

"RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes,' Pub.L. 91–452, § 904(a), 84 Stat. 947." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985) (citation omitted); *U.S. v. Artez Lamont Rogers, Harrison R. King*, 89 F.3d 1326, 1336–37 (7th Cir.1996). In civil RICO cases, Plaintiffs have the burden of proving their cases by a preponderance of the evidence. *See Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1302–03 (7th Cir.1987).

### 1. Racketeering Activity

Racketeering activity is defined in 18 U.S.C. § 1961(1) to mean simply committing one of a number of specified acts. *U.S. v. Rainone*, 32 F.3d 1203, 1209 (7th Cir.1994). One such act is knowingly executing a scheme to defraud a financial institution, by means of false or fraudulent pretenses, representation, or promises, in violation of 18 U.S.C. § 1344. By admitting that she created false teller transfer tickets on a regular basis to cover up the non-existent transactions via which money was removed from the Bank, E. Seguban admitted to a violation of 18 U.S.C. § 1344. Thus, E. Seguban engaged in "racketeering activity."

### 2. Pattern

RICO defines a pattern as at least two acts of racketeering activity within ten years. 18 U.S.C. § 1961(5). RICO's breadth reaches far enough to encompass multiple predicates under a single scheme which are related and which threaten continued criminal activity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 2899–2900, 106 L.Ed.2d 195 (1989). Whether a pattern exists in a given situation depends on a variety of factors: (1) the numerosity and variety of predicate acts, (2) the length of time over which those acts were committed, (3) the number of victims, (4) the existence of separate schemes, and (5) the occurrence of distinct injuries. *Liquid Air*, 834 F.2d at 1304. The touchstone fac-

tors are relationship and continuity. *Uniroyal Goodrich Tire Co. v. Mutual Trad. Corp.*, 63 F.3d 516, 524 (7th Cir.1995). Courts may find a pattern where there is only a single victim and a single scheme where there are repeated economic injuries. *Id.* at 1305.

As in *Liquid Air*, where each false invoice individually deprived the plaintiffs of specific revenue, *see Uniroyal*, 63 F.3d at 524, the instant case involves a great number of distinct injuries. Each teller ticket through which new cash left the Bank was a distinct injury. The Bank has shown that each teller ticket which increased the total amount of money taken represented a discrete attempt to deprive the Bank of money. Because E. Seguban engaged in the fraudulent transaction multiple times over a twelve-year period, her conduct constitutes a "pattern" pursuant to RICO.

### 3. Participation by Management Level Activity

The conduct prohibited by RICO is limited to management level activity. *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Citing *Reves*, the Seventh Circuit questioned whether E. Seguban's activity rose to the level of "management." *Seguban*, 54 F.3d at 393. In *Reves*, the Supreme Court held that an outside accounting firm could not be liable under § 1962(c), as it had not "conduct[ed], or participated, directly or indirectly, in the conduct" of the enterprise's affairs. *Reves*, 507 U.S. at 184–88, 113 S.Ct. at 1173–74. The Court stated that liability under § 1962(c) turns on whether a defendant "participated in the operation or management of the enterprise itself." *Id.* at 183, 113 S.Ct. at 1172. Nevertheless, the Court refused to restrict § 1962(c) liability to upper-echelon management. *Id.* at 184–86, 113 S.Ct. at 1173.

Recently, the Seventh Circuit responded to its own questions in this case about the scope of *Reves*. In *MCM Partners, Inc. v. Andrews–Bartlett & Assoc., Inc.*, 62 F.3d 967 (7th Cir.1995), the Seventh Circuit determined that lower-echelon management may operate an enterprise in violation

of RICO by "knowingly implementing decisions [of upper-echelon management], as well as by making them." *Id.* at 978 (citing *United States v. Oreto*, 37 F.3d 739, 750–51 (1st Cir.1994) (section 1962(c) applies to foot soldiers as well as to generals)). The *Oreto* court noted:

> *Reves* is a case about the liability of *outsiders* who may assist the enterprise's affairs. Special care is required in translating *Reves'* concern with "horizontal" connections—focusing on the liability of an outside adviser—into the "vertical" question of how far RICO liability may extend within the enterprise but down the organizational ladder. In our view, the reason the accountants were not liable in *Reves* is that, while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command through which the enterprise's affairs were conducted.

*Oreto*, 37 F.3d at 750 (*quoted in MCM*, 62 F.3d at 978) (emphasis in *Oreto*). In the instant case, it is difficult to characterize E. Seguban, an Assistant Teller Manager for the Bank, as an "outsider." She managed the regular teller line and "special services" teller line, she supervised approximately twenty tellers and supervisors daily, and she hired and fired tellers regularly. She was made aware of the intricacies of vault transactions. Moreover, she had the power to create teller tickets, to approve transactions reflected on those tickets, and to order those working under her to process those tickets. Accordingly, the Bank has shown that E. Seguban was involved in knowingly making and carrying out decisions for the Bank. As such, she may be liable under RICO for "management level" activity.

#### 4. Enterprise

■■■■ The next requirement for a RICO claim is that of an "enterprise." An enterprise is simply "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In light of recent United States Supreme Court case law, the Seventh Circuit questioned whether, as the Bank al-

leges, the requisite RICO "enterprise" may also be a "victim" of the alleged RICO violation. *See Seguban*, 54 F.3d at 393. The court finds that the two may be one in the same.

■■■■ Under § 1962(c), there must be "only some separate and distinct existence for the person and the enterprise." *Gagan*, 77 F.3d at 964 (quoting *Ashland Oil, Inc. v. Arnett*, 875 F.2d, 1271, 1280 (7th Cir.1989)). As the United States Court of Appeals Second Circuit stated, "This requirement 'focuses ... [§ 1962(c) ] ... on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity.' " *Riverwoods Chappaqua, Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir.1994).

■■■■ Again, § 1961(4) defines the term "enterprise" broadly: "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Section 1962(c) itself also sweeps broadly, forbidding "any person employed by or associated with *any* enterprise" from using that enterprise to engage in a pattern of racketeering activity. 18 U.S.C. § 1962(c) (emphasis added). Neither of these provisions deny that an enterprise may also be a victim under RICO. "Any enterprise meeting the definition of enterprise in § 1961 will do. Under § 1961 an enterprise may include a legitimate legal entity ... as the victim of the racketeering activity," so long as it is distinct from the "person." *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1557 (1st Cir.1994) (citing *United States v. Boylan*, 898 F.2d 230 (1st Cir.1990) (victim enterprise was Boston Police Department)). Under this analysis, so long as E. Seguban and the Bank are separate, as they are, the Bank may be the victim, as well as the enterprise, of a RICO violation.

■■■■ In 1982, the Seventh Circuit itself directly addressed the issue of whether a RICO enterprise may also be a RICO victim in *United States v. Kovic*, 684 F.2d 512 (7th Cir.1982):

Defendant's second contention is that the Chicago Police Department cannot be both the enterprise, whose affairs are conducted through a pattern of racketeering activity, and the victim of the racketeering activity. This Court has not been referred to any authority for the defendant's statement, and we are unable to find support for it in either case law or logic. *The not-very-surprising corollary to the premise that an enterprise need not be benefitted by a pattern of racketeering activity to come under RICO is that the enterprise may in fact be harmed by the illegal activity.*

*Kovic,* 684 F.2d at 516–17 (emphasis added). The court agrees with the *Kovic* court.

However, certain statements in *National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), have prompted some courts to question whether, in addition to a distinction between the RICO "person" and "enterprise," there must also be a distinction between the RICO "enterprise" and "victim." This court finds no such requirement in the language of *Scheidler.* When addressing the issue of whether the racketeering predicate acts must be accompanied by an underlying economic motive, the *Scheidler* Court recognized that, unlike the "enterprise" of subsections (a) and (b), the "enterprise" of § 1962(c) "connotes *generally* the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity." *Id.* at 259, 114 S.Ct. at 804 (emphasis added). The *Scheidler* Court further noted the four roles which an enterprise may play in § 1962, as described by one commentator: "prize," "instrument," "*victim,*" and "perpetrator." *Id.* at 259 n. 5, 114 S.Ct. at 804 n. 5 (emphasis added) (citation omitted). Nowhere did the *Scheidler* Court state or imply that an "enterprise" cannot be a "victim." To this court, these statements are not at all inconsistent with the notion that a RICO "enterprise" may also be the "victim" of RICO violations.

The United States Court of Appeals Third Circuit disagrees. In *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258 (3d Cir.1995), cited by the Seventh Circuit in *Seguban,* 54 F.3d at 393, the Third Circuit

interpreted *Scheidler* to prohibit a § 1962(c) action where the "enterprise" and "victim" are alleged to be one in the same. *Id.* at 267. The Third Circuit wrote:

[T]he Supreme Court held that the "enterprise" in subsection (c) is properly viewed as the "vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity." *Scheidler,* 510 U.S. at [259], 114 S.Ct. at 804; *Reves,* 507 U.S. at 182, 113 S.Ct. at 1171 ("Congress consistently referred to subsection (c) as prohibiting the *operation* of an enterprise through a pattern of racketeering activity and to subsections (a) and (b) as prohibiting *acquisition* of an enterprise.") Consequently, a victim corporation "drained of its own money" by pilfering officers and employees could not reasonably be viewed as the enterprise *through* which employee persons carried out their racketeering activity.

*Jaguar* 46 F.3d at 267 (emphasis original). Respectfully, this court does not agree with the leap of logic made by the Third Circuit from the Supreme Court's *Scheidler* statement that "enterprises" "*generally*" *are not* "victims," to the conclusion that "enterprises" *cannot be* "victims." *See Scheidler,* 510 U.S. at 259, 114 S.Ct. at 804. The Supreme Court did not draw, or imply, that conclusion. On the contrary, without indicating any disapproval or disagreement, the Supreme Court pointed out that at least one commentator believes that "enterprises" are also sometimes "victims" *See Id.* at 259 n. 5, 114 S.Ct. at 804 n. 5.

In the instant case, the Bank was no less a victim of the alleged misconduct than would be a third party. The court finds no rationale for holding otherwise. A corporation may allege both that it is a RICO "enterprise" as well as a RICO "victim" under § 1962(c). The Bank has so alleged, and it has demonstrated that it falls within RICO's definition of an "enterprise."

The court recognizes that its reading shelters a more expansive group of victims than does the Third Circuit's. The desire to restrict civil RICO coverage is understandable. *Schiffels v. Kemper Fin. Servs., Inc.,* 978 F.2d 344, 350 (7th Cir.1992). However, on

this issue, in light of the broad purpose and language of RICO as well as the absence of any limiting direction from binding precedent or Congress, the court concludes that the Bank's claim falls well within the shelter of the RICO umbrella.

Thus, the Bank has demonstrated the elements of a RICO violation by E. Seguban. There remain no questions of fact regarding those elements. As such, the court grants summary judgment in favor of the Bank on the substantive RICO claims against E. Seguban.

### C. Breach of Fiduciary Duty

Under Illinois law, the three elements required to establish a claim for breach of fiduciary duty are: 1) existence of a fiduciary duty; 2) breach of that duty; and 3) resulting damages to the plaintiff. *Martin v. Heinold Commods., Inc.*, 240 Ill.App.3d 536, 181 Ill.Dec. 376, 608 N.E.2d 449 (1992), *aff'd in part, rev'd in part on other grounds*, 163 Ill.2d 33, 205 Ill.Dec. 443, 643 N.E.2d 734 (1994). An agent owes its principal a fiduciary duty to treat the principal with the utmost candor, care, loyalty and good faith. *See Burdett v. Miller*, 957 F.2d 1375 (7th Cir. 1992). As its employee, an agent, E. Seguban owed the Bank those duties. Her embezzlement of its funds breached those duties. As a result, the Bank suffered a financial loss. The court finds that Bank has shown, via affidavits, depositions, and documentary evidence, that E. Seguban, at least, participated intentionally in the embezzlement of its funds over an extended period of time. No reasonable jury could find otherwise. As such, the Bank has demonstrated that E. Seguban breached the fiduciary duties she owed to the Bank and the Bank is entitled to summary judgment on the issue.

### D. Conversion

The Bank next states that, by embezzling the money from the Bank, E. Seguban thereby converted that money. The essence of conversion is the wrongful deprivation of property from the person absolutely entitled to possession. *Fonda v. General Cas. Co. of Ill.*, 279 Ill.App.3d 894, 216 Ill.Dec. 379, 665 N.E.2d 439, 442 (1996). At summary judgment, a plaintiff in a con-version action must demonstrate: (1) an unauthorized and wrongful assumption of control, dominion, or ownership over plaintiff's personalty; (2) plaintiff's rights in and to the immediate unconditional possession of the property; and (3) a demand for possession of the property. *General Motors Corp. v. Douglass*, 206 Ill.App.3d 881, 151 Ill.Dec. 822, 565 N.E.2d 93, 96 (1990). The evidence produced by the Bank, with or without the permissible negative inference, indicates that E. Seguban intentionally deprived the Bank of that money wrongfully. It is not disputed that the Bank had an absolute right to possession of the money at issue in this case or that it made a demand. In light of all the evidence presented by the Bank, the Bank has shown that E. Seguban created false transactions through which she was able to remove money from the Bank and spend it. Accordingly, E. Seguban is liable to the Bank for conversion.

### E. Conspiracy

Like all conspiracies, a RICO conspiracy need not be demonstrated by direct evidence of agreement; the agreement may be inferred from the circumstances. *Gagan*, 77 F.3d at 961 (citations omitted). The determination of what role defendants play in a criminal conspiracy is a question of fact. *United States v. Golden*, 954 F.2d 1413, 1418 (7th Cir.1992) (citation omitted). To prevail in a civil RICO conspiracy suit, plaintiffs must show by a preponderance of the evidence:

(1) that the defendants agreed to participate in the affairs of an enterprise through a pattern of racketeering activity; and

(2) that the defendants also agreed that someone would engage in at least two predicate acts to accomplish such goals.

*Id.* (citing *United States v. Neapolitan*, 791 F.2d 489, 498 (7th Cir.1986) (holding that RICO conspiracy liability is broad enough "to encompass those persons who while intimately involved in the conspiracy, neither agreed to personally commit nor actually participated in the commission of the predicate" offenses)). Section 1962(d)'s target is "the agreement to violate RICO's substantive pro-

visions, not the actual violations themselves." *MCM*, 62 F.3d at 979 (quoting *Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344, 348 (7th Cir.1992)). "The defendant need not have agreed to actually commit the predicate acts itself or even to participate in the commission of those acts so long as it agreed that the acts would be committed on behalf of the conspiracy." *Id.* (citation omitted).

As evidence of the Segubans' agreement, the Government submits proof of the various expenditures. Although the Segubans argue that the Bank has not demonstrated that they lived beyond their means, such an inference could certainly be drawn where their combined monthly income is less than $4,000 and they indulged in various luxuries. As to E. Seguban, such an inference is the only reasonable inference where the expenditures buttress the Bank's already well-supported case.

However, as to R. Seguban, the expenditures are the Bank's only brace. Leaning on this brace, the Bank argues that R. Seguban must have agreed that to E. Seguban's conduct, as he must have known that the expenditures were the fruit of ill-gotten gains. While suspicious, the expenditures were not so outlandish as to lead to the conclusion that no reasonable person would have believed they were legitimate. At this summary judgment phase, the Bank has not shown that R. Seguban was aware of the source of his wealth, although he must have been aware of the wealth itself.

The court notes that "the more a spouse knows about a transaction, *ceteris paribus,* the more likely it is that [he] will know or have reason to know that the deduction arising from that transaction may not be valid." *Resser v. C.I.R.*, 74 F.3d 1528, 1536 (7th Cir.1996) (citation omitted). Even where a defendant does not actually know of illegality, he may be liable for the illegality if his lack of knowledge is caused by conscious avoidance. *See United States v. Antzoulatos,* 962 F.2d 720 (7th Cir.1992) (noting the viability of "ostrich instructions").

Was R. Seguban simply an unobservant husband á la *Belle du Jour*, or a willing participant á la *Bonnie and Clyde?* The jury will decide. There is insufficient information regarding what R. Seguban knew about E. Seguban's conduct or the household finances, his education, his character, and the breadth of communication within the Seguban marriage. Substantial unexplained increases in a family's scale of living is not, standing alone, sufficient to establish agreement to a RICO scheme. Thus, there remain genuine issues of fact regarding whether R. Seguban had knowledge which would make a reasonable person question whether the sources of household income were legitimate, and, therefore, whether he agreed in some way to their illegitimacy. Accordingly, summary judgment is denied as to R. Seguban's participation in a RICO conspiracy.

For the same reasons, summary judgment must also be denied as to his participation in the Bank's supplemental claims. As the court cannot find, at this juncture, that R. Seguban conspired, it cannot find that E. Seguban conspired—as it takes two to form a conspiracy. Thus, summary judgment is denied as to E. Seguban on the Bank's conspiracy claims.

### III. *Conclusion*

Even viewing the evidence in the light most favorable to the nonmovants, the court finds that the Bank has presented evidence of every element of its claim with no response from the Segubans. The court finds that, as to the substantive counts against E. Seguban, the Bank's evidence demonstrates her liability such that no reasonable jury could find against the Bank, even without the permissible negative inference from her Fifth Amendment silence. Accordingly, summary judgment is granted in favor of the Bank on those counts. However, the Bank's evidence is not conclusive as to R. Seguban. Thus, the court denies summary judgment on all conspiracy counts.

IT IS SO ORDERED.